**Lawrence COLWELL, Plaintiff-Appellant,**

v.

**John W. GARDNER, Secretary of Health, Education, and Welfare, Defendant-Appellee.**

**No. 17133.**

United States Court of Appeals
Sixth Circuit.

Nov. 17, 1967.

---

Garland Wells, Hazard, Ky. (Wells & Wells, Hazard, Ky., on the brief), for appellant.

Moss Noble, Lexington, Ky. (George I. Cline, U. S. Atty., Moss Noble, Asst. U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before EDWARDS, Circuit Judge, KENT,* District Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

 This is an appeal from an order of the District Court in a disability benefits case under the Social Security Act, affirming the decision of the Hearing Examiner and of the Appeals Council. The only question involved is whether there was substantial evidence to support the decision of the Hearing Examiner that appellant was not unable to engage in substantial gainful activity by reason of a physical or mental impairment, which could be expected to result in death or be of the duration of twelve months.[1]

Appellant is now fifty-three years old. At the time he filed his application for disability benefits, he was forty-eight years old. He attended school for six years. His work up to the time he filed his disability claim was heavy manual labor, consisting of work as a hand-loader, and shooter in the coal mines. Apparently, it was after this work experience that he went to war where, in France, he became disabled as hereafter appears.

On May 27, 1963, appellant filed his claim for disability benefits under the Social Security Act. Nine years before he filed his disability claim, he went to a Vocational School, which was probably under the direction of the Veterans Administration. Afterward, he worked for seven years as an automobile mechanic on large trucks with the Davidson Motor Company. He left this job because of what he termed "arthritis" which, he said, completely disabled him.

In the hearing of the case before the Hearing Examiner, all of the expert medical evidence that appellant was totally disabled was undisputed by any of the physicians or orthopedic surgeons who were witnesses, either for the appellant or for the Secretary.

The Hearing Examiner found, however, that appellant had failed to establish that he was disabled from engaging in substantial gainful employment.

As to the history of this case, appellant first noticed this "arthritic" condition when he was serving in the infantry in the American Army in France during World War II. He described the background of his disability as follows: The infantry in which he served was attacking the Germans in a stretch of woods, and a shell came over a tank in front of him, and exploded near him, throwing him about fifteen feet from a ditch, where he came to. He went on, the next morning, and noticed he was sore in both hips, but he went on for three or four days and the pain got worse until he was "falling out" two or three times a day, when the front-line "medics" finally came along. "The front line medics took me

* Honorable W. Wallace Kent, Chief United States District Judge for the Western District of Michigan, sitting by designation.

1. The Social Security Act was liberally amended in 1965 to the advantage of an applicant for disability benefits by substituting for the requirement that an individual's impairment *must be expected to be of long continued duration* or to result in death, a new provision that he must have been under a disability that could be expected to result in death *or*

which has lasted or could be expected to last for a continuous period of not less than twelve calendar months. See Title 42 U.S.C.A. Sections 416 and 423, 1966 Cumulative Annual Pocket Part. The amendments are effective with respect to applications for disability insurance benefits and for disability determinations under Sections 416 and 423, in and after July 1965, if a civil action has been commenced under the Act, and the decision therein has not become final before such month. Section 303(f) (1) of Pub.L. 89–97 (1965).

in—I didn't know—woke up in the hospital." This was after fourteen days of continual combat as a rifleman.

As a result of the concussion of the shell and its effects upon him, appellant was taken to a field hospital in France; then to a hospital in England for three months; then he was returned to the United States where he was confined to Kennedy General Hospital in Memphis, Tennessee, for six weeks and, after that time, in many other Army hospitals.

Before relating the hospital reports and examinations of appellant by Army doctors, the case should be clarified at this point by the following statement of facts which will be hereinafter fully developed.

Dr. L. H. Wagers, M.D., of Hazard, Kentucky, Dr. C. Dana Snyder, M.D., an orthopedic surgeon, of Hazard, Kentucky, Dr. M. B. Payne, M.D., of Hazard, Kentucky, and Dr. W. K. Massie, M.D., an orthopedic surgeon of Lexington, Kentucky, all of whom examined appellant, gave it as their opinion that he was totally disabled.

This is what would seem to the layman a remarkable case of *total disability* caused by arthritis which developed over a period of twenty years, but which could not be objectively proved, and was not discernible by X-ray examination or physical examination until at the end of that period of twenty years. The evidence substantiating the foregoing consisted of testimony elicited by the Hearing Examiner from an expert orthopedic surgeon; *and it was undisputed.*

We will discuss the evidence in the record of all the hospitals where appellant was examined and treated, as well as the diagnoses of the Army doctors and psychiatrists from the time appellant was injured in combat action in France in 1944, which we have previously mentioned, to the time in 1963 when appellant filed his claim for disability benefits, as well as that of the expert medical witnesses, whose evidence was taken for the hearing of appellant's application for disability benefits, together with that of the Vo-cational Consultant, who was a witness on the hearing.

After being returned to the United States from the Army hospital in England, appellant, as mentioned, was confined to Kennedy Memorial Hospital in Memphis, Tennessee, on December 11, 1944, for six weeks. The medical experts there diagnosed him as being psychoneurotic, anxiety state, moderate, cause unknown, manifested by tension, apprehension, and multiple somatic complaints. They reported that he had a mental age of ten years, eleven months, A/C Wechsler mental ability scale—and complained of pain in hips and knees. X rays of chest, pelvis, spine, and knees were normal. Bones and joints were objectively normal.

From Kennedy General Hospital in Memphis, appellant was taken to Wakeman General Hospital at Camp Atterbury, Indiana, and, after three months, upon the finding that he was suffering from psychoneurosis, was discharged from the service. It was stated in the report from Wakeman General Hospital that his physical examination showed no arthritis, osteitis, osteomyelitis, or other orthopedic disease. Appellant claimed that all during this time he was suffering from a painful arthritic condition.

On May 3, 1945, the Veterans Administration at Columbus, Ohio, found that appellant was suffering from psychoneurosis, hysteria, and severe social and industrial incapacity, but that the arthritis claimed by appellant was not shown by the evidence of record.

On May 28, 1947, appellant was again examined by the Veterans Administration at Owingsville, Kentucky, where he complained of pain in both hips, particularly the left hip, and down the left thigh and leg. There was no objective evidence of rheumatism, atrophy, or ankylosis, and the diagnosis was again, psychoneurosis.

On June 29, 1947, appellant was examined at the Veterans Administration in Louisville, Kentucky, where his 50% disability rating was continued.

On October 26, 1949, appellant was again examined at the Veterans Administration at Louisville, where he complained of pain in the left hip, and limped on the left. A mental examination showed him slow and sluggish mentally; that he had poor judgment, and did not have true insight; that he was childish and immature, and his reasoning and judgment were inadequate. The diagnosis was psychoneurosis, conversion type reaction, anesthetic type.

On November 2, 1949, appellant was again examined at the Veterans Administration at Louisville and the Administration continued "service connected neuropsychiatric disability rating 50%—arthritis claimed by veteran not shown by evidence of record."

On May 20, 1952, the Veterans Administration at Louisville made a further examination of appellant where he again complained of "trouble with left leg," but there were "no abnormal physical findings—psychiatric examination shows claimant maladjusted and lacking in urge and industry and practically illiterate." The diagnosis again was "conversion reaction."

On May 29, 1952, another Veterans Administration examination was made at Louisville where it was reported that the veteran did not have symptoms of severe psychoneurosis sufficient to cause a severe social or industrial incapacity, and it was diagnosed: "Neuropsychiatric disability rating reduced from 50% to 30%" commencing two months in the future. The diagnosis was again, "conversion reaction."

On May 19, 1954, appellant had a "special neuropsychiatric examination" at the Veterans Administration in Louisville, where he complained of numerous ailments, stating that his hips were sore nearly all the time, and that his leg hurt him so much that he got nervous. "He believes that he is chronically and permanently ill and disabled in some way without knowing specifically what his body ailment is. His simple explanation is 'It's my hip. It may be arthritis.'" The diagnosis was the same as in all the prior examinations, being psychoneurosis, conversion reaction, chronic.

On June 1, 1954, the Veterans Administration at Louisville made another examination of appellant and found no change in neuropsychiatric incapacity and did not warrant change in service-connected status or evaluation of any disability, or contain any new or material evidence relevant to the question.

On June 12, 1957, a further examination was made at the Veterans Administration at Louisville, and stated appellant complained that his arthritis was worse since his last examination and he was sore in chest, back, and side. The diagnosis was "Conversion reaction, evidenced chiefly by a left limp display. The objective neurological examination is negative."

On July 2, 1957, a further examination at the same office revealed a continuing neuropsychiatric incapacity without any material change for the past five years, "rating 30%—static."

And now, in the next medical report, hereinafter mentioned, for the first time in fifteen years, since appellant was injured in combat duty in France in 1944, and after numerous hospital confinements, X-ray and physical examinations by countless Army physicians, psychiatrists, and Veterans Administration doctors, it was discovered that X rays of appellant's left hip showed multiple areas of calcification, diminished functional use, and that he actually had severe arthritis of the left hip joint, due to trauma, of which he had been complaining and vainly telling the doctors for fifteen years, and concerning which they had continually reported that the X rays showed no arthritis and that he was suffering only from psychoneurosis.

On November 12, 1959, appellant was examined at the Veterans Administrative Center at Mountain Home, Tennessee, and his chief complaint then was pain in his left hip during the prior fifteen years; that his condition during the prior year limited him to work as a mechanic to only half time. It was then stated: "X-rays of left hip showed some

multiple calcified areas; internal rotation—right hip 30°—left hip 10°; external rotation—right hip 85°—left hip 75°. Patient was given infra-red treatment but left hip did not seem to improve. Discharged—maximum hospital benefits. Diagnosis—arthritis of left hip joint, due to trauma. Treated, improved."

As hereafter set forth, this seemingly inexplicable situation was explained by Dr. C. Dana Snyder, an expert orthopedic surgeon, who testified without contradiction, that such severe arthritis develops over a long period of time, with no subjective or objective symptoms discernible, and that appellant in all probability had been suffering from this arthritis for twenty years, at the end of which period it could finally be proved by X-ray examinations, and at a time when appellant was totally and permanently disabled because of this condition.

On January 11, 1960, the Veterans Administration, Adjudicating Division, stated that the report of the Mountain Home Veterans Administration showed diagnosis was arthritis of left hip due to trauma—however, there is no record of arthritis in the service as alleged. The complaints were found to be functional and not on organic basis. Neuropsychiatric rating 30% continued.

On January 2, 1963, the Office Station of the Veterans Administration, of Louisville, reported that appellant had submitted to it a letter from Dr. M. B. Payne stating that appellant was one of his patients, and he complained of severe pain in left lower back and hip which had gotten worse recently; and Dr. Payne recommended appellant to the Veterans Administration for study and care. The Veterans Administration disposed of Dr. Payne's recommendation by saying he had made no findings, and continued appellant's diagnosis as conversion reaction, and arthritis of left hip joint.

We come then to the evidence before the Hearing Examiner, all of which was concerned with the disability of appellant as a result of his arthritis, as well as with the statement of a psychiatrist employed by the Social Security Administration, whose examination of appellant was limited to a psychiatric appraisal, and who gave a disgnosis that he was suffering from psychoneurosis, anxiety state, as well as from a vascomotor disease.

The first expert medical witness before the Hearing Examiner was Dr. L. H. Wagers, a physician of thirty-one years of practice and experience. Dr. Wagers, who was a physician for a coal mining company, with an extensive practice in caring for injured coal miners, testified, on the hearing, as to his examination of appellant based on objective medical evidence and clinical and X-ray evidence. The X rays showed destruction of the cartilage or cushions between the joints, which is a degenerating process. Dr. Wagers stated that appellant's condition will get worse as time goes on. He had been treating appellant over a period of years and in his testimony was permitted to quote from an authority, Dr. Richard T. Smith, of the Department of Rheumatology, Franklin Clinic, of Pennsylvania Hospital, Philadelphia, Pennsylvania, to the effect that a "patient with knee or hip damage should not sit down in the chair since each act of sitting requires the lowering and raising of the weight of the trunk. Instead raised chairs or high stools should be used. All other activity such as stair climbing, walking, standing and occupational, recreation excess should be limited." Dr. Wagers stated that appellant had extreme difficulty in even walking about or in sitting down or in getting up. He examined a number of X rays which were taken of appellant and interpreted them. Dr. Wagers' physical examination showed some atrophy of the muscles of the left leg of appellant. His left knee was larger; and he was not able to bend forward and touch his *knees*.

In response to the Hearing Examiner's interrogation of Dr. Wagers, the latter stated that it is not possible that the atrophy would result from disuse rather than from disease. Dr. Wagers diagnosed the condition of appellant as degenerative osteoarthritis.

Dr. C. Dana Snyder, a bone surgeon and an orthopedic surgeon, testified on the hearing. He stated that he had practiced orthopedic surgery for twenty-six years but, at the time of the hearing, was not able to practice it for the prior six years because his hands had been burned by X rays, but he could give a medical judgment on orthopedic cases because of his long experience in that specialty, and his continuing practice, and interpretation of X rays. His work was chiefly as an industrial physician in counties of eastern Kentucky and most of his practice was principally in the interpretation of X rays, and the examination and recommendation to employers of the physical condition of employees if they became injured in the mines. He examined appellant for the ·disease known as degenerative arthritis. Dr. Snyder made a complete examination of appellant and found that his chief complaint was pain in the left hip. His examination revealed that the left hip was ankylosed and showed partial inflection, and that appellant had some restricted motions in all directions in the lumbar spine. X rays taken by Dr. Snyder showed extensive calcium deposits in the soft tissues of the left hip and cartilages which surround the hip joint, and some degeneration of the head of the femur. He also found that appellant had ankylosis of the head of the femur to the acetabulum, the lateral view of the lumbar spine, and that the view revealed some calcium deposit extensions as spurring of the lumbar spine and lower dorsal spine. Dr. Snyder stated that it was a progressive condition which grows worse with time, and that anyone with as much trouble in the hip as appellant has "is going to have difficulty sitting down, rising up and walking, it's going to be quite painful and he can't do it efficiently, I don't care how hard he tries." Dr. Snyder gave it as his opinion that appellant was totally disabled as far as work is concerned, and that he didn't think that appellant could earn a living at anything. He saw no prospect that appellant's condition could be improved, so that he could engage in any kind of gainful activity. As he said, "I just don't see how it would be possible."

Before he became a physician and orthopedic surgeon, Dr. Snyder had actually worked in a mine. He knew the conditions under which miners have to work in coal mines, and doesn't know anything appellant could do in a coal mine. He further gave it as his opinion that anything in the way of employment that entailed any kind of exertion or movement would be impossible for appellant.

Dr. Y. S. Leung, who made the X rays for Dr. Rutledge at the request of the Hearing Examiner, found degenerative arthritic changes of the epiphyseal joints of the lumbosacral spine, proliferative bone changes on the anterior aspect of the dorso lumbar spine. His impression or diagnosis was: (1) Degenerative arthritis lumbar spine; (2) Arthritis with calcification left hip.

Going back to Dr. Snyder, he gave it as his opinion that appellant was not a malingerer, or that he was exaggerating his pain for disability compensation, but that he was perfectly honest and had what he claimed to have—and that there was sufficient pathology to account for all the symptoms of which appellant complained.

In explaining the difference between multiple calcification in the bursa of the left hip and ankylosis of the left hip, Dr. Snyder said that "Ankylosis and calcium in the bursa are two different pathologic conditions. Now the ankylosis is the deposit of calcium which ties the head of the femur to the acetabulum, [and that] deposit of calcium in the bursa, which is the tissue that surrounds the hip joint and holds in the fluid is spotty, in other words, it's not a continuous sheet—it's spotty, all over that there's multiple areas," and is not a part of ankylosis, but there definitely was some ankylosis at the time of the hearing.

As to whether appellant could do anything in the field of performance as an automobile mechanic, Dr. Snyder said he did not believe appellant could do this kind of work which requires a man with "quite a lot of dexterity to get around

under these automobiles and get over the fenders and work on the motors and transmissions."

Appellant, furthermore, in Dr. Snyder's opinion, could do no bench work, because he could not sit at a bench long enough to do anything on account of the pain and discomfort he has "from pathology in the hip."

When asked by the Hearing Examiner whether the subjective symptoms of rheumatism beginning in 1944 would have seemed to preclude appellant from engaging in bench work, and that since 1944, the only diagnosis and rating given to appellant by the Veterans Administration was psychoneurosis with a 50% disability rating, Dr. Snyder gave a most comprehensive answer and explanation, which is of vital importance in this case in view of the Secretary's contentions.

Dr. Synder replied to the Hearing Examiner as follows:

"This arthritis develops in any individual, particularly the rheumatoid type, which this man evidently has from the examination now, *develops over a long period of time with subjective symptoms that first are not discernible by X-ray examination and physical examination* as long as the joints are freely movable, *makes it difficult to diagnose except subjectively. This man has progressed now to the point where there are objective findings in support of the symptoms which he complains of. I don't doubt but what this man has had this trouble for twenty years, as his record shows, but you couldn't prove it up until very recently.*"

The Hearing Examiner continued:

"Q. The subjective symptoms reported by the various medical examiners and in the evidence in this case, are altogether of the impairment, arthritis of the right hip, but these medical examiners were told by the claimant that he was receiving first a fifty per cent VA disability for that condition and later, thirty per cent disability and the claimant has testified here today that

he has always believed that his disability rating was because of his arthritis. Now the disability rating has nothing to do with this arthritis excepting with respect to the Veterans Administration examiners show a rating of psychoneurosis and dates back to 1944 on left hip limp show. Is it possible, Dr. Snyder, that a man with a left limp, left hip and limp show receiving such a disability rating, psychoneurosis, could develop atrophy of the left hip area because of disuse because of the favoring?"

Dr. Snyder replied:

"I don't believe that any man can limp long enough, severely enough to affect the tissues and make them pathological if they were normal to start with."

The colloquy between the Hearing Examiner and Dr. Snyder continued:

"Q. You would include twenty years as—

A. I include twenty years.

Q. Now in the record of this case, Dr. Snyder, *the complaint first was left leg and then right leg?*

A. *That is characteristic of arthritis in its beginning stages; they have first one hip, one knee, one elbow, one shoulder; it spreads then to the other joints and in this rheumatoid pattern, which this man has, it usually affects very severely one or sometimes multiple joints, nearly always one joint. With this man it seems to affect him mostly in the left hip; but it's a progressive thing.*

Q. Now from your examination of the claimant and from your inspection of the X-ray, do you diagnose the claimant's condition as rheumatoid arthritis?

A. I do.

Q. That is all, Dr. Snyder.

ATTORNEY: What is the distinction between degenerative arthritis and rheumatoid arthritis?

A. You know there's all kinds of classifications for arthritis, but degen-

erative arthritis and rheumatoid arthritis in general are the same thing.

ATTORNEY: All right. I'll ask you, Doctor, if it isn't true that this disability and pain and discomfort in arthritic victims doesn't exist long before it can be shown on an X-ray film?

A. Oh yes, I stated that previously.

ATTORNEY: Now Doctor, your conclusion in this case that this man is totally and permanently disabled from performance of any kind of gainful activity whatever based on objective as well as subjective symptoms, is that right?

A. Yes, that's my opinion.

ATTORNEY: And you did give him a laboratory test by the X-ray?

A. Yes, I did.

ATTORNEY: And you examined him in your office thoroughly and that's considered clinical examination?

A. That's correct."

■ The Hearing Examiner, if he considered any medical evidence as bearing upon disability, which is doubtful—apparently relied upon the evidence of Dr. W. K. Massie, an orthopedic surgeon. Dr. Massie was employed by the Social Security Administration, and was solicited by it to give his views as to appellant's disability. The foregoing is no reflection upon Dr. Massie but, as hereafter appears, it, together with other factors, goes to the weight to be given his statement, under the circumstances of this case. The principal witnesses to establish appellant's total and permanent disability were Dr. Wagers, an expert medical witness, and Dr. Snyder, an orthopedic surgeon, with twenty-six years of experience in that specialty, and an additional six years' experience in the interpretation of X rays. They, of course, were subjected to cross-examination.

Dr. Massie saw the appellant on only one occasion, although, as stated, Dr. Wagers had treated him over a period of years. Dr. Massie was not a witness, and, accordingly, not subject to cross-examination. How long Dr. Massie had practiced medicine does not appear, but comment of other witnesses shows him to be a reputable practitioner. Dr. Massie's evidence consists only of a statement signed by him and not corroborated by any other evidence.

Dr. Massie stated, however, in his signed report, that appellant was totally disabled. However, this total disability was set forth as "temporarily totally disabled." Dr. Massie based his statement that appellant was temporarily totally disabled on the ground that a surgical operation could be performed on appellant, because "of the discomfort incident to this abnormality of the hip", and he stated that, with the stabilization of the hip by this surgical operation, appellant *should* be able to return to a gainful occupation, "though a stiff hip could be of some interference in the work of a mechanic." Dr. Massie diagnosed the appellant as suffering from "myositis ossificans, left hip with a functional hip flexion contracture." He reported that the physical examination showed the left hip as being fixed in a 10° external rotation and no internal rotation, and that X rays showed marked tilting of the sacrum, and the hips and pelvis showed a left hip irregularity of the joint space.

Dr. Massie further stated that "this man states that if this painful hip could be eradicated, he would be able to accomplish a job." Dr. Massie did not say how the operation would be performed, or whether there was any probability that the hip might not be stabilized, and whether there was a probability that appellant's pain could be eradicated; and, not being a witness, he could not be cross-examined. It is here to be emphasized that Dr. Snyder, the only orthopedic surgeon who was a witness, stated that, in his opinion, appellant would be injured, rather than helped, by this type of surgery. It is to be said that, in comparison with the actual testimony of Dr. Snyder and Dr. Wagers, the mere written statement of Dr. Massie is certainly entitled to little weight, as hereafter appears from authoritative adjudications.

Nevertheless, Dr. Massie, as well as Dr. Snyder and Dr. Wagers, agrees that at the time of the hearing appellant was totally disabled.

Dr. Carl Wiesel, a psychiatrist, was asked by the Social Security Administration for a psychiatric examination of appellant; and he thereafter filed a report stating that appellant gave "the impression of being quite uncomfortable and in pain"; and Dr. Wiesel diagnosed him as suffering from:

"1. Psychoneurosis, Anxiety State in an individual of borderline intelligence

2. Raynauds Disease

3. Disease of the left hip joint."

Dr. Charles C. Rutledge, an orthopedist, in response to the solicitation of the Secretary, filed a report stating that appellant walked with a marked limp on the left, and continued:

"Lateral and posterior bending and twisting are markedly limited. Supine on table, patient keeps the left knee flexed and states that it hurts too badly to straighten this out. Straight leg raising 135 degrees bilaterally. Knees flexed, the thighs can be brought about vertically. Flexing of both lower extremities causes pain in the left hip. Patient complains of pain on moving either extremity and testing the hip. Knees and ankles seem to have fairly normal range of motion. Reflexes: Patella two plus, Achilles one plus bilaterally. Circumference of thighs: left 16½", right 16⅝". Legs, left 13⅞", right 12¾". Length of lower extremities 33½" bilaterally. There is hypesthesia left lower extremity both medial and lateral from the hip down."

As heretofore mentioned, Dr. Y. S. Leung took and interpreted the X rays on which the conclusion of Dr. Rutledge, in part, rested, and the latter, in his report mentioned that fact, together with his impression of the diagnosis, as follows:

"Degenerative arthritic changes of the epiphyseal joints of the lumbosacral spine are seen. Intervertebral joint spaces are well maintained. Proliferative bone changes on the anterior aspect of the dorso lumbar spine are noted. Negative for spondylolisthesis. Conclusion: 1. Degenerative arthritic changes. 2. Radiopaque material in the area of the right hip due to either injected radiopaque material or multiple calcifications in the bursa of the left hip.

"IMPRESSION:

(1) Degenerative arthritis lumbar spine.

(2) Arthritis with calcification left hip."

All of the expert medical witnesses, both on behalf of appellant and on behalf of the Secretary, agreed that appellant was suffering from a serious hip disease and none contradicted the testimony that he was totally disabled.

The evidence of appellant's pain in his left hip was testified to by him on the hearing, and appears in all of the Army hospital reports. Appellant also testified to the fact that thereafter he attended a Vocational School and worked for Davidson Motor Company for a period of seven years, until he could no longer do the job because his left hip became so extremely painful. There was also in the evidence the statement of a representative of the Davidson Motor Company, filed as the result of a contact with the Social Security Administration, in which it was stated that appellant had to quit his job of auto mechanic in November or December of 1962. "He seemed to have severe arthritis and his legs seem to bother him so bad he could hardly get around. He was paid something like $1.25 an hour during the entire period. His job * * * required some lifting and a great deal of bending and heavy pulling on wrenches to loosen and tighten nuts and bolts. He was also required to lie on his back on a creeper and scoot back under cars and work in close closed positions on transmissions, etc. The job required a great deal of strenuous exertion. The quality of his work was excellent as far as man-

agement was concerned. During the last couple of months before termination of his employment, he missed work frequently due to pain in his legs. As far as I know, the only reason he quit his job was because of his arthritic condition. He was a qualified automobile mechanic, which requires a great deal of exertion."

With all of the foregoing evidence of total disability before him, the Hearing Examiner went to great lengths to secure the evidence of a so-called Vocational Consultant, Dr. Charles F. Elton, stating to Dr. Elton, on the hearing, that he was being called "as an impartial witness in order for the Hearing Examiner to have the benefit of your opinion as to what work the claimant can do when impairments are taken into consideration, and what, if any, jobs exist in our economy for a man who can do what the claimant can do."

Dr. Charles F. Elton, not a medical school graduate, admitted that appellant could do no heavy physical labor. Witness Elton further stated that he had no doubt that appellant suffered pain, but "whether that pain is sufficient to keep him from engaging in work, I'm sorry I would have to say that I think he is able to work with the degree of pain that *I* think in my judgment he has." Witness Elton also testified, in answer to questions from appellant's counsel:

"Q. In your opinion, Dr. Elton, can an individual who is suffering extreme pain and anguish do any kind of gainful employment?

A. Yes, sir."

Witness Elton, however, admitted he was not better qualified than a physician to determine whether appellant could work while suffering such extreme pain and anguish. However, he gave it as his opinion that, after referring to the Dictionary of Occupational Titles, which "provides a job description of some 40,-000 different jobs in our economy," that appellant could perform the job of a radio assembler, who assembles small parts to form units or sub-assembly parts, or who mounts sub-assemblies on a panel or in a cabinet, using such tools as a screw driver, a wrench, file, and pliers; that he thought appellant could do the job of a "marker" who prints and attaches price tags to articles of merchandise by hand or using a machine, and which requires an eighth-grade education, although appellant did not have such an education, and could not read or write; and finally, Dr. Elton gave it as his opinion that he thought appellant could also be employed as an automobile service-station attendant.

Although, as hereafter appears, Witness Elton's testimony was disregarded by the Hearing Examiner, we consider it of interest to note certain of his testimony and the not-disinterested examination of the witness by the Hearing Examiner.

The remarkable aspect of Witness Elton's testimony is the fact that instead of testifying as to the work appellant could do when his impairments were taken into consideration and whether such jobs were available (which was the purpose for which he was called, according to the statement of the Hearing Examiner) he, in fact, undertook, with the Hearing Examiner's encouragement, to become an expert medical witness, although he had never had any medical education. This type of testimony started when, in answer to the Hearing Examiner's question, Witness Elton answered that, "in rendering a vocational judgment about this claimant, is the fact that while the evidence is not uniform or certainly not agreed upon, *there is some evidence in the literature that the arthritis, particularly, rheumatoid type arthritic conditions, have functional or non-physical components, and I believe on the basis of the testimony* that I've heard and *that I have read* that there is a likelihood that this functional component of Mr. Colwell's arthritic condition—non-physical component of his condition may exist and as a matter of fact may be progressing in a downhill fashion over the course of the years, and I think that to talk about his vocational opportunities without knowl-

edge of the degree of involvement of this conversion reaction or psychoneurosis or other diagnostic categories would be rather meaningless, because I believe at the present time that Mr. Colwell, in terms of his education, age and experience, is unemployable or he does not have the residual skills and capacities to work with the assumption that I am making that there is this functional component, which as I indicated earlier I would like to have expert psychiatric testimony as to whether it does exist and furthermore whether it is remediable."

What he required from the Hearing Examiner was further medical evidence on the non-physical component overlay, and he preferred to reserve his opinion until additional evidence from a competent specialist.

Witness Elton went on:

"I have no doubt that Mr. Colwell is suffering pain as I have observed him and have heard the medical doctors' testimony, and to me it doesn't make any difference whether the pain is physically induced or whether it's non-physically induced. The pain may be there. And in his subsequent employment future, whatever it may be, should it be found that there is not a physical basis for his complaint, he still may be disabled in another sense of the word and be unable to work."

He stated that he did not like to answer the question as to substantial gainful employment for appellant until he had additional medical expert testimony, both orthopedic and psychiatric.

Of course, at the time Witness Elton made this statement, there was the undisputed testimony in the record of Dr. Snyder, an expert orthopedic specialist of long experience, and the testimony of Dr. Wagers, who had been treating and examining appellant for a long time, that appellant was totally, and permanently disabled; and there was the further evidence from all of the reports of the Army hospitals and Veterans Administration Centers that he was suffering from psychoneurosis.

On this request by Witness Elton for a further orthopedic and psychiatric examination before he would give his opinion as to whether appellant had any residual capacities for employment, the attorney for appellant strenuously objected to a delay to secure such additional evidence, stating that "this case has been drawn out beyond all reason at the present time. The defendant in this case had more than a year to prepare this case or his defense to it. * * * Now at this rate, this case can be drawn out for another two or three years and this man, if he's entitled to Social Security benefits, he ought to be drawing them now."

However, the Hearing Examiner stated that, for the benefit of Witness Elton, he would postpone the case in order to enable an orthopedic surgeon, Dr. Massie, from whom, he stated, he would solicit an opinion, and a psychiatrist, from whom, he stated, he would also solicit an opinion, to submit statements. We have already reviewed the unsworn statement of Dr. Massie, which was filed in the case. In addition to Dr. Massie's statement, there was filed the report of Dr. Carl Wiesel, who made a complete examination and diagnosed appellant as suffering from psychoneurosis, Anxiety State, in an individual of borderline intelligence, and Raynauds disease. With this evidence of the two statements filed and received by the Hearing Examiner, Witness Elton returned to the witness stand to give his opinion, which he stated would ultimately be based upon this further evidence of the orthopedist and psychiatrist in question.

After the written statements of Dr. Massie and Dr. Wiesel were made a part of the record, Witness Elton stated he had no need of further information before expressing his opinion as to what work appellant could do and what, if any, jobs which he could do, were available. As a Vocational Consultant, he started out with the Dictionary of Occupational Titles which, as we have had occasion in so many cases to show, meant little in the way of proof of what jobs an injured man could do. Miracle v. Celebrezze, 351 F.2d

361 (C.A.6); Massey v. Celebrezze, 345 F.2d 146 (C.A.6); Ross v. Gardner, 365 F.2d 554 (C.A.6); Henninger v. Celebrezze, 349 F.2d 808 (C.A.6).

The Hearing Examiner asked Witness Elton whether, if it appeared that appellant was suffering from an arthritic condition of his left hip with subjective symptoms of pain in his other extremities, weakness, inability to lift, and limitation to lateral or posterior bending and twisting, he would have an opinion as to whether appellant had retained transferable or assidual abilities which would have enabled him to be gainfully employed in the economy. This question indicated that, at that time, the Hearing Examiner had practically assumed that appellant was disabled from doing the heavy work he had previously done; and the only question was whether he had any residual skills and capacities.

In answer to the Hearing Examiner's question, Witness Elton stated that, even in view of his impairments, appellant would have such residual skills and capacities, and, further, expressed the view that appellant's "anxiety reaction" had contributed markedly to his physical tensions and complaints, *"in addition to the actual physical disability that the evidence indicates he has.* Furthermore, I think in view of Mr. Colwell's age and education and experience, the prognosis for treatment for this anxiety reaction is rather poor, but the condition is remediable." Witness Elton, at no time, stated how the condition would be remediable, nor did any other witness. He continued: "On the other hand, I think that Mr. Colwell, from the evidence, has lived with this anxiety reaction for a period of some twenty years and the evidence is not henceforth clear that it has gotten better or has gotten worse in that period of time. He has engaged, and been able to live with it, and engage in a job with this condition during this period of time." Witness Elton then went on to state that he did not know of Raynauds disease. This had been the disease which Dr. Wiesel, the psychiatrist employed by the Social Security Administration, diagnosed

appellant as suffering from; but Witness Elton stated that if it was a vascomotor disease, marked by attacks of cold, or emotional excitement, and capillary congestion and livid swelling which might result in gangrene (which was the meaning given to the disease in the medical dictionary) then his "impression of what you've read and the other evidence and testimony in the case, I would feel that Mr. Colwell's disability in toto are as much influenced by this anxiety reaction as they are by any other thing. I am very aware [that Dr. Wiesel stated that this functional disorder has physiological effects] and I've stated in my testimony that the prognosis of treatment would be poor, in my judgment * * * I would feel that Mr. Colwell would be helped by treatment except the conditions, this has existed for twenty years, his limited education and intelligence would mitigate against his being helped by treatment, but under some set of conditions which I do not think exists in this area or even in Lexington, or maybe in the State of Kentucky, Mr. Colwell could be helped with this anxiety reaction, but I think— if I must say—I would judge that Dr. Wiesel did not recommend treatment because of these other obvious circumstances, is not available in this area, it's expensive and it takes an average level of intelligence or better to benefit from the type of treatment that would be required in this case."

"Q. Which this plaintiff doesn't have?

A. Which the plaintiff does not have. Yes, sir.

Attorney: All right, I thank you."

In spite of the character of expert medical testimony from the vocational witness, who had never studied medicine, his testimony, on the whole, was contrary to the Hearing Examiner's stand that appellant was not disabled; and although Witness Elton attempted to show that appellant could do "light work," including work as an automobile mechanic of a light nature, this was contradicted by undisputed medical expert testimony.

In any event, the Hearing Examiner disregarded all of Witness Elton's testimony that appellant could not perform heavy physical labor although having residual capacities, by holding that the evidence did not show appellant was not unable to engage in substantial gainful activity by reason of a physical or mental impairment. If the Hearing Examiner had found that appellant was disabled from his former work of heavy manual labor, but that he had residual capacities, he would have been obliged to make such finding and specify the kind of lighter work which appellant could perform. This, the Hearing Examiner clearly refused to do, and, by his holding, obliterated all of the Vocational Consultant's evidence about residual capacities to perform such lighter work.

Since the Hearing Examiner disregarded all of the evidence of the Vocational Consultant that appellant was disabled for heavy manual labor and could perform only light work, and since the expert medical evidence that appellant was totally disabled was uncontradicted, it is difficult to ascertain how the Hearing Examiner arrived at his decision that appellant was not entitled to disability benefits on the ground that "the evidence fails to establish that claimant was 'disabled,'" within the meaning of the Act.

The only conclusion that might explain the Hearing Examiner's decision is that he held that appellant was obliged to submit to the surgical operation mentioned by Dr. Massie, and that, until such surgical operation was found unavailing, appellant could not be considered disabled. Such a conclusion could only be conceivably arrived at under the Regulation that states that an individual will not be deemed under a disability, if, with reasonable safety to himself, the impairment can be diminished to the extent that he will not be prevented, by the impairment, from engaging in substantial gainful activity. 20 C.F.R. 404.1502.

The Hearing Examiner outlined Dr. Massie's written statement, and quoted the Regulation above mentioned. Furthermore, the Hearing Examiner stated in his decision that the testimony of Dr. Snyder and Dr. Wagers "who appeared and orally testified," was directly in conflict with Dr. Massie's written statement, and that neither Dr. Snyder nor Dr. Wagers "practiced specially in the field of orthopedic impairments." In this statement, the Hearing Examiner was clearly in error. Dr. Snyder practiced orthopedic surgery for twenty-six years until his hands were burned by X rays used in that practice, and for the following six years up to the time of the hearing, he was engaged principally in interpreting X rays in the field of orthopedic impairments; and it was because of his practice in the interpretation of X rays that he took the X rays in this case and made the examination of appellant in which he found the bone degeneration and ankylosis of appellant's left hip. Moreover, Dr. Wagers, although not an orthopedic surgeon, had treated appellant intensively for his arthritic left hip and cared for many other persons suffering from similar orthopedic impairments.

The only evidence that an operation could be performed was the signed statement of Dr. Massie who saw the appellant only once and who stated that, with stabilization of the hip by a surgical operation, appellant *should* be able to return to a gainful occupation with a stiff hip "though a stiff hip could be of some interference in the work of a mechanic." It is to be noted that there is no indication from Dr. Massie's statement or from anyone else what kind of employment appellant could perform after a surgical operation, or whether it would be *substantial* gainful employment, for it is not enough that such employment be merely gainful.

Here, it becomes necessary to compare the written statement of Dr. Massie, who did not appear at the hearing, with the testimony of Dr. Wagers and the testimony of Dr. Snyder, who testified, in reply to a question whether the operation mentioned by Dr. Massie would help appellant, as follows:

"Well, I can only state that in my opinion that *this man would be injured*

*rather than helped by this type of surgery.* He has a rotated femur. Now at the head of the femur out of position is the acetabulum and more or less fixed with needle bone callus, whatever you want to call it, and in order to do the type of surgery, Dr. Massie * * * would have to break up any already ankylosed hip in order to straighten up that leg and rotate it into its normal position and then do some type of fixation which would increase the new bone formation and get a new ankylosis which would not relieve pain and would not, in my opinion, help him in getting about and doing any type of work." (Emphasis supplied.)

Dr. Snyder further testified that appellant could not stoop and bend, and get down on his knees to adjust machines; and that he did not think appellant had sufficient education to print and attach price tags to articles, since he could not read or write.

Dr. Wagers testified that, in his opinion, as a medical man, and, from his experience in diagnosing and treating injuries such as appellant had in his left hip, an operation would not be helpful *and that appellant probably would be injured by an operation on his hip, and it would not relieve him of any of the pain, or suffering, or anguish.* He stated that he had treated appellant very intensively during 1963 but, instead of improving, he got worse all the time and that no operation on his hip was going to help him, and would not help his other joints, such as his knees which were "equally bad."

The above testimony of Dr. Snyder and Dr. Wagers was supported by the statement of Dr. Rutledge, an orthopedic surgeon, and Dr. Leung, as far as their diagnoses were concerned, that appellant was suffering from degenerative arthritis of the spine, and arthritis with calcification in his left hip.

The foregoing is substantial evidence that appellant was suffering from degenerative arthritis and, from the testimony of Doctors Snyder and Wagers, that he was totally and permanently disabled.

■■ Even if the written statement of Dr. Massie could be considered as probative evidence that appellant's disability was remediable, then the decision of this court in Ratliff v. Celebrezze, 6 Cir., 338 F.2d 978, 11 A.L.R.3d 1124, is applicable. In that case, a surgeon had suggested a certain operation, and the applicant objected to such surgery. On such objection, the surgeon then stated that he was of the view that such treatment should not be urged upon the applicant, because "he could not be absolutely certain that the operation would rehabilitate him." This court held, under the foregoing circumstances, that applicant's refusal to submit to the operation did not constitute a refusal to cooperate in remedial treatment as required by Regulation so as to preclude the receipt of disability benefits. Under the Regulation, reasonable refusals to undergo surgical operations for rehabilitation are clearly permitted, since, according to the Regulation, it is only "with reasonable effort and safety to himself" that an applicant is required to undergo such remedial surgery in order to avoid a finding of non-disability. See Annotation to Ratliff v. Celebrezze, supra, 11 A.L.R.3d 1124, 1143.

In the instant case, with the testimony of Dr. Snyder, an expert in orthopedics, and Dr. Wagers, appellant's attending physician, that such a surgical operation, as proposed, would be of no help to appellant, but would result in further injury to him, and with only the written statement of Dr. Massie, opposed to their testimony, it would be unreasonable to hold that appellant should disregard the medical advice of his attending physician, and also the advice of his orthopedic surgeon, to the effect that such an operation would result in further injury to him, and would not help him in any way, and undergo such a surgical operation, or be deprived of disability benefits; and such a decision would not be sustained by substantial evidence; and, if that was the basis of the Hearing Examiner's decision, it was not sustained by substantial evidence.

In Cyrus v. Celebrezze, 341 F.2d 192, 195, (C.A.4), the court said:

"The medical evidence that Cyrus suffers from a disability is uncontradicted. The only conflict is as to the extent of his residual capacity. Normally, it is for the Secretary and not the courts to resolve conflicts in the evidence. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). *But where the Secretary places reliance upon one portion of the testimony to the disregard of overwhelming evidence to the contrary, the Secretary's conclusions may not stand.* Thomas v. Celebrezze [331 F.2d 541 (C.A.4)]." (Emphasis supplied.)

In Sebby v. Flemming, 183 F.Supp. 450 (D.C.W.D.Ark.), two physicians who had treated the applicant for disability benefits over a period of years stated that he was totally incapacitated, while a physician to whom the applicant had been referred by the Social Security Administration stated that in view of his condition, he would place the applicant in a class "with slight limitation of activity" and "I believe he should be able to do some work." The Hearing Examiner on the evidence of the physician of the Social Security Administration held that while the applicant was unable to perform work requiring stress, strain, or heavy physical exertion, it did not appear that he would be precluded from engaging in many types of light or sedentary work, and that the "consultative specialist" expressed the opinion that he should be able to do some work, and that if he could overcome his anxiety, he would get along much more satisfactorily. The Hearing Examiner, accordingly, held that the applicant's impairments "are not of such severity as would continuously preclude him from engaging in any substantial gainful activity * * *." Chief Judge John E. Miller, in reversing the decision of the Secretary and remanding the case for the granting of disability benefits, held that there was no substantial evidence to support the conclusions of the Secretary, and stated: "Two doctors who have treated [applicant] over a period of

years advise him not to work and state that he is totally incapacitated. The only evidence in support of the Referee's findings is the medical report of Dr. Hall, based upon one examination of the plaintiff." In his determination of the case, Judge Miller said:

"After reading and considering the whole of the record, the court does not find that the Referee's conclusions are supported by substantial evidence. It is obvious that the findings of the Referee are based almost exclusively on the medical report of Dr. Hall. However, the court does not find that Dr. Hall's report is sufficient to constitute substantial evidence in the light of the other medical evidence and other facts reflected in the transcript as a whole. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

"In discussing the requirement of a review of the whole record in cases of this type, Professor Davis, in Sec. 29.03 of his recent Treatise on Administrative Law, quotes Professor Jaffe at page 127 of Volume 4 as saying:

" ' "Obviously responsible men would not exercise their judgment on only that part of the evidence that looks in one direction; the rationality or substantiality of a conclusion can only be evaluated in the light of the whole fact situation or so much of it as appears. Evidence which may be logically substantial in isolation may be deprived of much of its character or its claim to credibility when considered with other evidence." ' [Jaffe, Administrative Procedure Re-examined: The Benjamin Report, 56 Harv.L.Rev. 704, 733 (1943).]"

The Hearing Examiner quoted copiously from a medical textbook on "Hysterical Joints," "Psychogenic Rheumatism," and "Differential Diagnosis." The textbook does not appear to have ever

been in evidence, or the passages quoted ever explained or commented upon by medical witnesses. The consideration by the Hearing Examiner of such evidence was erroneous as a matter of law. Ross v. Gardner, 365 F.2d 554 (C.A.6); Glendenning v. Ribicoff, D.C., 213 F.Supp. 301; Cook v. Celebrezze, D.C., 217 F. Supp. 366.

■ Moreover, the Hearing Examiner misconceived the application of law when he stated: "Statements by the medical doctors as contained in the record concerning the claimant's disability and opinions expressed about his not being able to engage in substantial gainful activity are not and should not be determinative of the question whether or not an individual is under a disability under the Act * * *. [It] is the function of the physician to determine *impairments*, but it is an administrative function to determine *disability*." This is only one aspect of the rule. While an expert medical opinion as to disability to engage in substantial gainful employment is admissible for consideration by the Hearing Examiner, and not, *in itself*, binding upon him, nevertheless, if such opinion is not controverted by substantial evidence to the contrary, the Hearing Examiner's decision adverse to such expert medical opinion, must be set aside. Teeter v. Flemming, 270 F.2d 871, 77 A.L.R.2d 636 (C.A.7).

In Hill v. Fleming, D.C., 169 F.Supp. 240, 245, it is stated:

"In our opinion there was no substantial evidence to contradict the medical opinions that plaintiff was totally and permanently disabled; neither was there any affirmative evidence that he had or could have, in view of his limited education and physical condition, engaged in any substantial gainful employment.

"Expert opinions on such issues are admissible evidence to be considered by the fact finder, but when they are not repudiated in any respect by substantial evidence to the contrary, an adverse decision on these ultimate facts should be set aside as based on 'suspicion' and 'speculation.'"

In Gaden v. Gardner, D.C., 263 F. Supp. 374, 376, the court said:

"In this instance we have the claimant's and her physicians' evidence as to her disability. It is unequivocal. There is no countervailing evidence at all. The examiner's dissatisfaction with the claim was based only on surmise and conjecture that the evidence submitted was somehow faulty and inadequate. The court cannot agree. It is not expected that the claimant's burden should be carried to a point beyond a reasonable doubt."

In Celebrezze v. Warren, 339 F.2d 833 (C.A.10), it was held that where "uncontradicted medical evidence tended to establish disability of claimant, the decision of the Secretary denying benefits was not supported by substantial evidence."

In Miracle v. Celebrezze, 351 F.2d 361, 378 (C.A.6), the court said:

"When a claimant comes forth with evidence of serious physical impairment, the record must contain evidence on which the denial of the claim may be based; and where there is uncontroverted medical testimony that the applicant is unable to engage in any substantial gainful activity, it is the duty of the Secretary of Health, Education, and Welfare to award him the relief requested, assuming that all other qualifications are met."

In Ross v. Gardner, 365 F.2d 554, 558, 559 (C.A.6), the court said:

"Moreover, the Hearing Examiner further committed error in his decision in holding:

" 'The Hearing Examiner cannot make a finding of "disability" based solely upon the opinion or conclusion expressed by a physician.'

"This is contrary to our holding in Hall v. Celebrezze, supra, [314 F.2d 686,] at 689, where it was held:

" 'The Secretary gave no weight to the uncontradicted opinion evi-

dence of Doctors Scott and Blair heretofore set forth with respect to Hall's disability. Since the statute required that the disability result from a "medically determinable physical or mental impairment." (42 U.S.C.A. § 416(i) (1) and § 423(c) (2)), the claimant had no way of establishing his case if his credible medical evidence is disregarded.'"

Where a Hearing Examiner has received expert opinions on the issue of a claimant's ability to work and they are not repudiated in any respect by substantial evidence, an adverse decision should be set aside as based on suspicion and speculation. Hilber v. Ribicoff, 196 F. Supp. 460 (D.C.Mont.).

Finally, the Hearing Examiner held that, since there was a conflict in the testimony between the witnesses as to whether appellant had rheumatoid arthritis or degenerative arthritis, or whether rheumatoid and degenerative arthritis were the same, or whether appellant was suffering from myositis ossificans, a condition of inflammation and bony deposits, or ossification of muscle, it was his function to weigh the conflicting medical evidence and to distinguish the actual medical facts from the unproven medical conclusions.

 But this so-called conflict or difference in evidence has nothing to do with, or any bearing upon, appellant's total disability; and any conclusion arrived at by the Hearing Examiner on the basis of such "conflict" was erroneous.

In Walker v. Gardner, D.C., 266 F. Supp. 998, 1002, 1003, it was held:

"The evidence of the defendant's medical experts controverts the diagnosis of Parkinson's disease. One states that plaintiff suffers from a conversion reaction, manifested by tremor, weakness, and slow sensory responses. Another states that he has both a conversion reaction and a depressive reaction. The third feels that he may be in need of shock therapy.

What is significant about this testimony is not what it controverts, but what it does not controvert. In short, the medical experts disagree as to the exact cause of plaintiff's condition, but defendant's experts do not dispute the existence of the condition, nor that it is disabling. They merely ascribe the condition to a mental, rather than a physical ailment. They do not offer a scintilla of testimony that plaintiff is able to perform any substantial, gainful employment. * * *

"The ultimate question in cases of this kind is not as to the exact causation of a disabling impairment. The ultimate questions are (1) does plaintiff have a medically determinable physical *or mental* impairment, etc., and (2) if so, does it render him unable to engage in any substantial gainful activity? For example, take the case of the individual who suffers from sheer physical weakness which makes it impossible to work; one doctor says he has a chronic coronary insufficiency, while another thinks his problem is emphysema. What difference? The Act concerns itself with results, not exact causes.

"So in this case, all doctors agree that plaintiff has a severe tremor and bodily weakness. Some doctors say that the condition is totally disabling, *and none says that it is not*. Whether deriving from physical reasons, or because of a profound psychoneurosis, or both, no physician suggests that plaintiff's condition does not render him functionally unable to work. It has persisted for many years, and shows no signs of going away. The Hearing Examiner, however, gives no weight to the testimony of plaintiff's physicians, relying on certain administrative regulations. In this he is in error. Hall v. Celebrezze, 6 Cir., 1963, 314 F.2d 686. * * * *"

See also our recent decision in Branham v. Gardner, 383 F.2d 614 (C.A.6), decided September 8, 1967.

 It will be noted that we have not based any part of our determination on the undisputed diagnoses of psychoneurosis of appellant which appeared in the official records of the Army doctors, Army hospitals, and Veterans Centers, at eleven different hospitals, and Veterans Administration Centers covering a period of nearly twenty years, as well as the diagnosis of the psychiatrist especially appointed by the Social Security Administration, which was made during the hearing of the case before the Hearing Examiner, since it appears entirely sufficient to base our holding on the substantial evidence of the total and permanent disability suffered by appellant in his hip injury. But it should be observed that, in any event, the Hearing Examiner cannot fragmentize appellant's several ailments and the medical opinions regarding each of them so that he fails properly to evaluate their effect in combination upon appellant. Dillon v. Celebrezze, 345 F.2d 753, 757 (C.A.4).

This is a review of the second hearing of this case before the Hearing Examiner. It was ordered remanded by the District Court after the first decision of another Hearing Examiner. On the second hearing before the Hearing Examiner in the present case, it was afterward reviewed by the Appeals Council, and again by the District Court.

 After the long pendency of this application, we see no reason to remand the case for the taking of further testimony. Cyrus v. Celebrezze, 341 F.2d 192 (C.A.4); Cooke v. Celebrezze, 365 F.2d 425 (C.A.4).

In accordance with the foregoing, the decision that the appellant was not disabled from performing substantial gainful employment is without the support of any substantial evidence in the record; and the judgment is accordingly reversed, and remanded to the Secretary for the allowance of disability payments to appellant.