Aelrid J. BARTLETT, Plaintiff,

v.

SECRETARY OF the DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, Defendant.

No. 1540.

United States District Court,
E. D. Kentucky,
Covington Division.

Aug. 2, 1971.

Stephen T. McMurtry, Covington, Ky., for plaintiff.

Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., for defendant.

### MEMORANDUM

SWINFORD, District Judge.

The plaintiff, Aelrid J. Bartlett, brings this action under the provisions of 42 U.S.C. 405(g). On March 21, 1969, he filed an application for disability benefits alleging that he became unable to work on December 5, 1967, (later changed to December 1, 1967, at the request of the plaintiff (Tr–103)) because of "back ailment". The application was denied initially and upon review. The decision of the Secretary became final on August 11, 1970, and this action was timely filed on October 9, 1970. The record is now before the court on the motion of the defendant for summary judgment. Briefs on the motion have been filed by the parties and a transcript of the proceedings heretofore had in connection with the plaintiff's claims was filed as a part of the defendant's answer.

On April 10, 1968, the plaintiff filed another application for disability benefits in which he stated that his disability was "results of operation for pinched nerves causing partial loss of use of the right leg". (Tr–146). His disability was alleged to have commenced on December 1, 1967. This claim was also denied initially and upon review and the decision of the Secretary became final on February 24, 1969. Mr. Bartlett was notified by a letter from the Appeals Council that if he desired a review of the decision that a civil action should be commenced in the district court of the United States in the judicial district in which he resided within sixty days from February 24, 1969. (Tr–205). No civil action was filed on the decision, but approximately one month later the application for benefits, which is the subject of this civil action, was filed.

The record discloses that the plaintiff is now 60 years old. He has an eighth grade education and has worked as a

bakery helper and as a delivery truck driver. He testified that as a baker's helper he had done all the work in a bakery, from light to heavy, such as frying doughnuts, operating a bread wrapping machine, bread molders, mixers and slicers. In his own words, "I did everything in the bakery." (Tr–40). For twenty two and one half years prior to December of 1967 he worked as a salesman and route delivery man for the Ziegler Towel Supply Company.

He testified that his impairments first started in 1953 when he was hit from the rear by a vehicle. This injured his back and leg and the condition was aggravated when he was hit again in 1956 in a similar accident. (Tr–41–43). His chief complaint at that time was pain in his upper back and a stiff neck. Treatment by doctors improved his neck but the pain started to go down and become worse and ten years later, at the suggestion of Dr. Albert Vesper, he went to the Mayo Clinic for examination. A diagnostic nerve block relieved his pain for about a month. Then "one of them pains hit me in the side" and caused him to hit another vehicle, so he decided to go back to Mayo's for an operation. (Tr–55). In December of 1967, he had a rhizotomy in an attempt to relieve him of his groin and flank pain. This operation was described by Dr. Alfred Uihlein of the Mayo Clinic as follows:

> "On December 5, 1967, under x-ray control, the sensory component of the 1st lumbar nerve root on the right side was divided between silver clips." (Tr–173).

At the hearing in December of 1968, the plaintiff contended that the operation did not stop the pain; that "I still got the pains right now yet what I went up there for to get rid of, and before my operation I could walk. I had no trouble at all except when the pains would hit me. I could walk, hop up and down off that truck, walk up and down off steps and everything else, but after the operation I can't." (Tr–56–57).

At the subsequent hearing on September 10, 1969, Mr. Bartlett testified that he had gained thirty pounds in the last year because of his lack of exercise. "I can't bend, I cannot lift. I actually can walk maybe a square without stopping, a square and a half and I'll stop at least two or three times." (Tr–108). He still complained of pain in his low back which radiates down through the groin and right leg. He said activity brings on pain in his neck and upper spine. (Tr–114). He is treated twice a week by Dr. Robert Burkart, a chiropractor, but takes no medicine for his pain. Once a month, if the pain gets "too bad" he takes a pain pill given him by the doctors at the Mayo Clinic, and he also takes two aspirin every night because they seem to "relax" him. (Tr–124). He drives his car and works a little in his garden but has done no work since the first of December in 1967. He receives a pension of $200 per month from a union retirement fund, but this is based on his employment record and not for any disability. (Tr–134).

After the hearing on September 10, 1969, the hearing examiner made his decision that the plaintiff was not entitled to benefits and made a finding that his prior decision of February 3, 1969, was "res judicata and binding on the issues of disability through the effective date of the application therein under consideration and the evidence submitted subsequent to such decision does not warrant reopening or revision thereof." (Tr–22).

The plaintiff filed a request for review and stated his reasons for disagreement with the hearing examiner's action:

> "I don't think the HE (hearing examiner) realizes how bad off I am. My leg gives out. I can't go to work and my stomach is filing up with water." (Tr–15).

On December 9, 1969, the Appeals Council advised Mr. Bartlett that his request had been granted. The letter in part is as follows:

> "We wish to obtain additional medical evidence in your case and have requested the State agency to arrange to have you examined at no expense to you.

The State agency will communicate with you in the near future so that arrangements for such examination may be made." (Tr–14).

The letter also advised him that he could submit any further evidence to the Appeals Council by mail within 20 days and that he and/or his representative could appear before the Appeals Council in Arlington, Virginia.

Thereafter, the plaintiff was examined by Dr. Thomas J. Radley, an orthopedic surgeon of Cincinnati, Ohio, and Dr. Paul Harry Klingenberg, a general surgeon of Covington, Kentucky.

The medical evidence has been carefully reviewed by the court and the record discloses that it was fully summarized by the hearing examiner after the two hearings requested by the plaintiff and again by the Appeals Council on review. (Tr–198–201, Tr–19–20, Tr–7–10).

Dr. Burkart, a chiropractor, testified that he treated the plaintiff for about a year in 1956. This treatment was for the cervical and upper thoracic injury he sustained from the truck wreck. (Tr–57). In March of 1968, Dr. Burkart began treating him again for the pain in his back. He stated that he found adequate physical findings to justify the pain which the plaintiff claimed to have. (Tr–65). It was his opinion that any work which would require the plaintiff to stand or sit for any length of time would "be out of the question". (Tr–68). This testimony was given at the hearing in 1968 and he has continued to treat Mr. Bartlett since that time.

Following the operation at the Mayo Clinic in December of 1967, Dr. Alfred Uihlein reported to Dr. Vesper, the plaintiff's local doctor, that

"(P)ostoperatively Mr. Bartlett had some muscle spasm but this gradually disappeared and he felt that his preoperative pain had been relieved by his surgical procedure. We sincerely hope that this pain relief will persist. He has been dismissed from our care. We have advised him to refrain from returning to his former occupation for one month from the date of his surgery after which time he should be able to resume full duty. If we can be of any further assistance to him with his problem at any time, feel free to write us. It was a pleasure to be of assistance to this man for you, as well as for himself. He was given some pain relieving medicine which we hope will be sufficient for him during the early postoperative recovery period. If he requires any more, we would appreciate your prescribing same for him." (Tr–173).

This report was dated December 15, 1967.

Dr. William Chambers, an eminent neurosurgeon of Cincinnati, Ohio, testified as a medical advisor at the hearing in 1968. He had not examined the plaintiff but he had studied all the exhibits prior to the hearing. He heard Dr. Burkart testify and examined the x-rays with him. After hearing the plaintiff testify, Dr. Chambers requested the hearing examiner to "elicit from him a more accurate description of the radiation of the pain, where it starts, exactly where it goes, and this I would like for both the upper part of the spine and the lower, to know if it goes down one leg, whether it's the back of the leg, front of the leg, side or what, if it goes into any particular holes, and the reason for this request for more accurate delineation is that certain nerves supply certain parts." (Tr–71). Thereupon, in answer to questions, the plaintiff described his pain in great detail. (Tr–71–78). Dr. Chambers was of the opinion that the plaintiff's impairment was "moderate" and that he could perform sedentary or light work. He also stated:

"With the severity of pain which the applicant describes he could hardly refrain from taking his pain medication, and the fact that he does get along on aspirin, and very little bit of that, would make one think that the pain is not of tremendous severity." (Tr–91).

Dr. Chambers, in his testimony, referred to the examination of the plaintiff by Dr. Richard B. Budde, a neuro-

logical surgeon of Cincinnati, Ohio. Dr. Budde examined the plaintiff on May 28, 1968, and made the following report:

"The neurological examination at this time reveals the patient to be alert, cooperative and oriented. He is overweight with a very protuberant abdomen. There is no evidence of cranial nerve deficit. Sensory examination reveals decrease in sensation to pin prick in the L 1 dermatome on the right side. This is post-operative. The motor function reveals good strength in all four extremities. The deep tendon reflexes are equal and rather hyperactive throughout. There are no Babinski, Hoffman, cerebellar or meningeal signs. Straight leg raising test is negative. Forward and backward bending and lateral rotation of the spine is unremarkable. There is a well healed surgical scar in the lower dorsal and upper lumbar region in the midline. There is no abnormality of the patient's gait that I could note. There is some difference in size of the two legs, the right being smaller than the left. The measurements showing the right thigh to be 17¾ inches while the left thigh is 18½ inches. The right calf is 13 inches while the left calf is 13½ inches.

"It would appear from what the patient states and the present findings that he probably is disabled, although from a pure neurological standpoint unless he were disabled through pain, I see no indication of a total disability at this time. Of course the pain problem is intermittent and apparently only present when he is extremely active but can hit him when he is at rest also." (Tr–178).

Dr. Budde examined the plaintiff again in May of 1969 and found little change in his condition. He stated:

"The neurological examination was essentially unchanged over that of a year ago except for a slight increase in the protuberance of his abdomen.

"My general impressions at this time are that he is not totally disabled and that probably a reduction in weight would help him tremendously. I really cannot add too much to the letter which we sent you approximately one year ago." (Tr–237).

Dr. A. H. Oleynick of Baltimore, Maryland, a consultant in Neurology for the Bureau of Disability Insurance, from the medical evidence concluded that the plaintiff was capable of light work if it did not require excessive walking. (Tr–184).

Dr. A. J. Vesper, a general surgeon of Covington, Kentucky, who referred the plaintiff to the Mayo Clinic, advised the Social Security Administration on April 8, 1969, as follows:

"I had not seen this man for a year and he has deteriated markedly. Increased to 160 pounds in weight—a gain of 30 pounds due to inactivity required by his back. Sits extended in chair—not flex to normal position. Heavy deposit of fat above buttock. Stiff and even impossible to ambulate, unable to work is readily evident." (Tr–232).

The record also contains a "To whom it may concern" letter from Dr. Vesper of July 23, 1969, which is identical to his statement of April 8, with this addition: "This man has aged greatly in past two years." (Tr–242).

Dr. J. Park Biehl, a neurologist of Cincinnati, Ohio, examined the plaintiff in March of 1968. His report contains the following:

"Examination of the limbs reveals no limitation to straight leg raising on either side. There is local tenderness over the hip joint, especially superiorly. Rotation of the femor produces no pain. He is able to do such things as squat down and up slowly without pain, and there is no spasm in the back. The legs are well developed although the right calf is perhaps a centimeter smaller than the left. Reflexes are rather brisk and equal bilaterally, and there is no significant sensory loss in the limbs. Gait is normal, although I did not test him after he walked a long distance.

"Impression: It seems to me that his complaint is one of arthritic pain which may have been produced by osteo-arthritis or perhaps trauma surrounding his surgical procedure of last November. There does not seem to be any neurologic aspect to his case at the present time. The rhizotomy appears to have been successful in treating his original complaint." (Tr-233).

Dr. Thomas J. Radley, an orthopedic surgeon of Cincinnati, Ohio, examined the plaintiff on December 30, 1969. His "Examination" is as follows:

"This man is 5′2½″ tall and weighs 155 pounds. He is able to dress and undress and get on and off the examining table without trouble. There is a normal alignment of the head, neck and shoulders. There is a full range of painless motion of the shoulders. There is a full range of motion of the head and neck. There is some tenderness in the mid line at D–4. There is a 6″ scar in the midline lower dorsal upper lumbar area. There is some tenderness to palpation in this area. There is no palpable muscle spasm in the posterior neck or dorsal or lumbar areas. This man walks without a limp. There is no scoliosis, abnormal kyphosis or lordosis. Back motion is as follows: flexion 65°, extension 20°, right lateral bending 25°, left lateral bending 25°, rotation to the right 30° and rotation to the left 30°. Pain is experienced at the extremes of motion and the pain is localized over the lower dorsal upper lumbar areas. He is able to stand on each foot separately, bearing the entire weight of his body. The dorsalis pedis and posterior tibial pulsations are not definitely palpable. There is no edema or varicosities. The knee jerks and ankle jerks are bilaterally equal and normal. The right calf measures 12½″ and the left calf 13″. The right thigh measures 17½″, five inches above the patella and the left thigh measures 18″, five inches above the patella. The leg lengths are equal at 34¾″. The cremasteric reflexes are absent. The abdominal reflexes are present. The Babinski sign is negative bilaterally. There is decreased sensation involving the entire right lower extremity and particularly involving the upper lateral aspect of the right thigh. There is a full range of painless motion of the hips, knees and ankle joints. Straight leg raising on the right is to 45° with back pain and to 60° on the left with back pain. The knee flexion test is negative bilaterally. There is tenderness to palpation over the left flank. There is no specific muscle weakness involving the lower extremities. While sitting on the examining table with his legs completely extended, he is able to flex his back to 65°." (Tr-243-244).

X-rays showed a normal alignment and mineralization of the spine and minimal degenerative changes throughout the lumbar and lower dorsal spine.

Dr. Radley concluded his report by this statement:

"I believe that this man does have an unstable back, secondary to his surgical procedure and secondary to the congenital deformity involving the transitional lumbosacral vertebra. I do believe that there is some exaggeration in his complaints and from an orthopaedic standpoint he should be able to do work in the light or sedentary category. I do believe that it would be advisable for him to have a peripheral vascular consultation." (Tr-245).

In view of this last statement of Dr. Radley, a vascular surgical examination was arranged for by the Appeals Council (Tr-13) and Dr. Paul H. Klingenberg, a general surgeon of Covington, Kentucky, examined Mr. Bartlett. On May 14, 1970, Dr. Klingenberg advised the Social Security Administration that he considered "him able to perform sedentary activity on a sustained basis." (Tr-247).

The findings of the Appeals Council are as follows:

"1. The decision of the hearing examiner issued February 3, 1969, is final as to the claimant's entitlement to a period of disability and disability insurance benefits as of that date.

"2. The claimant's impairments are not so severe as to preclude light to sedentary work activity.

"3. The claimant retains the residual physical capacity to engage in sedentary to light work activity within his former work experience and skills.

"4. The evidence fails to establish that the claimant's impairment prevented him from engaging in substantial gainful activity for any continuous period prior to the date of this decision which has lasted or can be expected to last at least 12 months.

"5. The claimant was not under a 'disability', as defined in the Act, commencing at any time prior to the issuance of this decision." (Tr–11).

■ It is well settled that the court does not consider the case de novo and judicial review is limited to inquiry as to whether there is substantial evidence in the record as a whole to support the findings of the Secretary. Ross v. Richardson, 6 Cir., 440 F.2d 690, decided April 9, 1971; Rose v. Cohen, 6 Cir., 406 F.2d 753; Wolf v. Gardner, 6 Cir., 386 F.2d 295.

■■ The court must conclude that the findings of the Secretary are supported by substantial evidence. The plaintiff's repeated assertion of disabling pain does not foreclose attack on the credibility of such assertion. A fact finder's conclusion, based upon more persuasive evidence, either that the asserted pain does not exist or is of such moderate degree as not to foreclose gainful employment, is not forbidden. Halsey v. Richardson, 6 Cir., 441 F.2d 1230, decided May 4, 1971.

■ While Dr. Vesper was of the opinion that the plaintiff was "unable to work", the Secretary may believe or disbelieve the opinions of physicians or other experts within the realm of his duty to pass on the credibility of witnesses. Ragan v. Finch, 6 Cir., 435 F.2d 239 (1970).

Dr. Vesper's statement—"even impossible to ambulate"—is subject to absolute refutation by other medical evidence. He made this statement in April and July of 1969. Dr. Budde examined the plaintiff in May of 1969 and found his condition essentially unchanged since his examination in May of 1968. At that time Dr. Budde stated: "The motor function reveals good strength in all four extremities * * * There is no abnormality of the patient's gait that I could note." (Tr–178).

The plaintiff's attorney, in his brief, is critical of the hearing examiner for his reference to Dr. Vesper as a "skin specialist". He asserts "that because of this rather glaring mistake by the hearing examiner and in view of the fact that Dr. Vesper was a major witness for the claimant, and perhaps more credible in his diagnosis, the decision of the hearing examiner is suspect * * * and had he been aware that Dr. Vesper was a general surgeon rather than a skin specialist who was making a diagnosis outside of his specialty, he might have decided differently." In view of this he asks, in his brief, that the application be remanded for the taking of further evidence and for a re-evaluation by the hearing examiner.

The court has noted the reference in the hearing examiner's "Evaluation of Evidence" to Dr. Vesper, "the skin specialist" (Tr–21). It is also noted that in the "Summary of Medical Evidence" that the hearing examiner said: "A report from Dr. A. G. Vesper, dated April 8, 1969, Exhibit B–34, whom the claimant (emphasis added) referred to as a skin specialist that treated him for a non-disabling cancer of the nose and forehead, stated that he had not seen the claimant for a year and he had de-

teriorated markedly." (Tr–20). Dr. Vesper's professional qualifications, found on page 235 of the transcript, show him to be a general surgeon and the court is not impressed with the claim that the hearing examiner was unaware of this.

The plaintiff testified that he had seen Dr. Vesper about three times from 1968 to 1969. When asked why he went to see him, he replied:

"A Well, I had some skin cancers on my nose. I felt he could take care of them and that's when he examined me and examined my whole back and everything and instead of him taking care of the skin cancer I had to go to Dr. Higgens and he took the skin cancers off my forehead and my nose, right here and here (indicating).

Q You say you went to Dr. Vesper to have a growth removed from your nose?

A Yes, and the forehead right here (indicating).

Q What happened while you were there?

A He advised me to go to Dr. Higgens.

Q Who is Dr. Higgens?

A He is a skin specialist.

Q Did he treat you for your other condition?

A No, he is just a skin specialist, he did no treatment of any other condition at all. He sent them away and they came back as skin cancer and that's what he treated me for.

Q He removed it from your nose?

A My nose here and forehead. I may have to go back and get these taken off.

Q They are all right now aren't they?

A These here are, yes. He says he's going to take these off.

Q You don't claim that these are disabling to you whatsoever?

A No, no. That's why I never mentioned them, but I've got a report from Dr. Higgens." (Tr–120–121).

The court is of the opinion that this discrepancy on the part of the hearing examiner is immaterial and that the plaintiff has been given every opportunity to establish his claim. Even taking the plaintiff's position, the matter was corrected by the Appeals Council's review of the hearing examiner's findings.

Although the defendant has not moved for dismissal of the complaint, the court is inclined to agree with the hearing examiner that this action is res judicata because no civil action was commenced within 60 days after the decision of February 3, 1969, denying the plaintiff benefits under the Act. 42 U.S.C. 405(g), (h). Johns v. Celebrezze, 272 F.Supp. 533 (D.C.1967); Boles v. Celebrezze, 210 F.Supp. 856 (D.C.1962). Instead another application was filed, claiming the same date for the onset of disability.

As stated by Judge Michie in the Boles case, "if the applicant in this case is permitted to have his claim relitigated, as he has sought to do, there would be no end to the controversy, and the provision in the statute which requires an action to be brought within sixty days after notice of a decision would become meaningless."

At any rate the plaintiff has had "two bites at the apple" and he cannot now complain that the decisions are "defective and supported by unsubstantial evidence."

■ The burden of establishing eligibility for social security benefits is upon the claimant and this he has failed to do. May v. Gardner, 6 Cir., 362 F.2d 616, 617; Campbell v. Gardner, 6 Cir., 370 F.2d 921.

The motion of the defendant for summary judgment should be sustained and an order to that effect is this day entered.