Eva HERTZ

v.

SECRETARY OF HEALTH, EDUCA-
TION AND WELFARE OF the
UNITED STATES.

Civ. A. No. 76–453.

United States District Court,
E. D. Pennsylvania.

Jan. 27, 1977.

Lester Krasno, Pottsville, Pa., for plaintiff.

David W. Marston, U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

Before this Court are cross-motions for summary judgment filed by the plaintiff and defendant, respectively. Plaintiff instituted an action in this Court for benefits under the Federal Coal Mine Health and Safety Act, 30 U.S.C. § 901 *et seq.*, after her claim was heard and denied by an administrative law judge (ALJ) and by the Appeals Council of the Social Security Administration.

The plaintiff's decedent, John W. Hertz, committed suicide on July 8, 1971, by hanging. The easy and almost irresistable conclusion suggested by such fact, namely, that death was self-imposed and unrelated to "black lung" is one reached by the ALJ and the Appeals Council, but without careful analysis of the record.

The decedent's employment as a "miner" was, in the language of the ALJ, "at least twenty years or more" (R. 10). During all of that time he was subjected to the precise conditions adversely affecting health contemplated by the Act under which this claim was filed. The decedent's long years of employment in the mines, more than twenty years, entitles the plaintiff to *all* the presumptions available under the Act and the ALJ so stated:

> "Now, Counsel, let me state that the exhibits that have been entered into the evidence and made a part of it, to me amply demonstrate coal mine employment of sufficient length to give claimant the benefit of any presumptions that the law allows. And for that reason, I think testimony as to the length of the employment is superfluous. * * *" (R. 38)

The plaintiff lived with the decedent and was dependent upon him throughout their entire marriage, commencing May 20, 1934 (R. 39). He did nothing, during his entire life time, other than mining (R. 41). He ceased working about the middle of June, prior to his death in July, 1971 (R. 41). This resulted from his inability to breathe and walk described as "shortwinded" (R. 42) a classic symptom of pneumoconiosis resulting from extended employment as a miner. Over the years, as his condition worsened he worked less than a full week, sometimes "two or three days". This situation had prevailed for about 10 years prior to his death (R. 43). The employer's statement that his "absenteeism was minimal" (R. 132) does not, contrary to the ALJ's conclusion, disprove the plaintiff's assertions because two or three day work weeks were not unusual in the anthracite industry. The ALJ's reliance on the employer's statement (R. 11) was misplaced. It was neither credible nor substantial in the light of plaintiff's uncontradicted and subsequently corroborated testimony:

> "Q. Now, the last mine he worked for was for the Philadelphia and Reading Coal and Iron, is that correct?
>
> A. Right.
>
> Q. In the last year prior to the time he stopped working entirely in mid-June of 1971, how frequent—how frequently would he miss work?
>
> A. Oh, it was often. Every week he would miss some work. It was a day or two days, sometimes three days a week. Just about—
>
> Q. When you say a day or two or sometimes three days a week, is that the number that he worked or the number that he was out?
>
> A. That he was out.
>
> Q. So he missed as much as three days a week in the last years?
>
> A. Right, right.
>
> Q. And what was the reason why he missed the last years of his life with such frequency?
>
> A. Well, he was really weak. And coughing. Wasn't able to walk or walk steps.
>
> Q. Did he complain of this to you?
>
> A. Oh, yes, he did."
>
> (R. 44)

The decedent understandably complained both to his wife and to Dr. Purcell (R. 44, 45). He was seized by constant coughing spells (R. 45) and spitting (R. 46). He was unable to sleep or walk up steps (R. 46).

He lost weight, 65 to 70 pounds, over a three to four year period and saw Dr. Purcell at least monthly (R. 47, 48). He became weak (R. 47). He was driven to and from work, a distance of about 2 miles (R. 48), rested immediately upon arriving home (R. 48), told plaintiff of his "good buddies" doing part of his work while on the job and never helped with household chores because of his condition (R. 49). He could walk no more than "half a block" (R. 50) and gave up his hobbies (R. 50). He referred to his condition as "getting worse and worse" (R. 52). He became depressed (R. 52), sat a great deal (R. 53), quit all social organizations (R. 53) and in mid-June, 1971, quit work (R. 55). This testimony, uncontradicted on this record and subsequently corroborated by a daughter's testimony (R. 56 *et seq.*) seems not to have been fully considered by the ALJ. His rejection thereof seems to have been almost exclusively based upon the employer's simple, single and uncorroborated statement of "minimal absenteeism". Significantly, this latter statement is unsupported by the decedent's actual work record. That alone would demonstrate that the decedent worked 6 days per week as apparently assumed by the ALJ.

As his condition worsened his depression became evident to other members of the family. He was described as "a terribly depressed man" (R. 59), whose condition was becoming "progressively worse" (R. 60), and who sometimes expressed "dismay" over his condition (R. 60).

It is this testimony which has been rejected by the ALJ based upon the limited report submitted by the employer, unsupported by actual work records and unsupported by live testimony. We believe that the evidence relied upon by the ALJ in rejecting the testimony above discussed was insubstantial. This observation necessarily leads us to a discussion of the medical evidence, portions of which may also have been relied upon by the ALJ in rejecting so completely the testimony of the plaintiff and her witnesses.

Dr. Leroy Purcell, the decedent's attending physician, testified that he treated the decedent for pneumoconiosis commencing about 4 years prior to his death and continuing until the date of death.

"Q. When did he first display the symptoms of pneumoconiosis to you?

A. I'd say approximately four years before he died.

Q. I see. And did you treat him for pneumoconiosis from that time until his death?

A. Yes, sir.

Q. With what frequency did Mr. Hertz see you in the four years prior to his death?

A. Every three to four weeks.

Q. And was that specifically for the symptoms of pneumoconiosis?

A. Yes, sir.

Q. And what symptoms of pneumoconiosis did he display to you during that period?

A. The complaints consisted of dysmia, which is shortness of breath, cough, accompanied by a rather profuse expectoration. Insomnia—that was loss of sleep. That was a big factor in the loss of his weight because he didn't sleep at nighttime. Didn't get a proper rest. And besides, his appetite was constantly affected. So between the loss of weight and the loss of his appetite, that brought on the loss of strength and he also lost a lot of weight because of those things.

Q. What did you observe about his emotional condition over that four year period in which he was suffering from these symptoms?

A. Well, I would say that he began to get emotionally upset approximately maybe a year before he passed away."

(R. 63, 64).

He had advised the decedent to quit the mines at least four years prior to death (R. 65). He described the decedent's emotional state as follows:

"Q. What specifically was the nature of his emotional disturbance in the period of time prior to his death?

A. Well, he began to worry and talk considerably about dying. Seemed to be obsessed with the thought and mind that it was not going to last very much longer.

Q. What did he think was killing him?

A. Well, the loss of weight and his cough, shortness of breath and poor appetite.

Q. What—what is the cause of his poor appetite and insomnia?

A. What is the cause of it?

Q. Yes.

A. Oh, his anthracosilicosis and emphysema.

Q. In what manner was the anthracosilicosis producing the insomnia and the loss of weight?

A. Well, in the first place, he didn't rest at night then. It was very unusual for him to have what we call a good night's sleep.

And that in turn affected his appetite. And when his appetite had worsened, well, then be began to lose weight. And he still had the cough and the shortness of breath which he had to contend with."

(R. 66, 67)

He concluded:

"A. Yeah, I think the fact that he was so badly affected by anthracosilicosis and emphysema was instrumental in causing him to worry about himself and eventually went to a depression.

Q. With the depression leading to what?

A. To his suicide."

Upon examination by the ALJ he stated:

"Q. So for four or five years, you treated him before he died?

A. Yes, sir.

Q. Now, the emotional disturbance that he had, would it have caused loss of sleep or loss of appetite?

A. Well, yes. That's very characteristic in the people who are emotionally disturbed, especially in depressive psychosis. And they have difficulty, great difficulty in sleeping and the appetite. But it's also almost impossible to separate that because anthracosilicosis with emphysema causes all of that too.

Q. What—what we're really getting down to is whether or not his—the emotional disturbance that he felt was based on something real or unreal. And what your testimony is is that it was real and that he had breathing problems, am I right?

A. Yes, sir.

Q. Is the severe loss of weight that he had more characteristic of the disturbance emotionally or of pneumoconiosis as a disease entity?

A. Well, I wouldn't say that the extreme loss of weight was due to anything more than anthracosilicosis and the emphysema. Of course, when you (UNINTELLIGIBLE), it's so mixed up. I mean the losing the weight and loss of appetite and he feels badly. All those things put together will bring about an extreme loss of weight such as he had experienced.

Q. All right. Did you give him any sort of sleep medication to make him sleep?

A. Occasionally, yes. But not persistently.

Q. Not on a regular basis?

A. No, sir."

(R. 70, 71, 72)

The testimony as to the decedent's condition was further corroborated by that of James Frances Eagen which we shall not review (R. 75 et seq.) and the statement of William J. Labadis (R. 135) co-employee of the decedent who testified as to his condition and his work habits.

All of the evidence reviewed or to which we have made reference has, in essence, been rejected by the ALJ. It appears that he has rejected all evidence as to work

habits and inability to work in favor of the employer's unsworn statement as to "minimal absenteeism" unsupported by any actual work record as to days actually worked (R. 132). As already indicated, we cannot accept a four-line statement unsworn to and unsupported by records of actual days worked as credible and substantial evidence as against live testimony, corroborated by statements.

The lay testimony and statements above mentioned, the medical testimony above mentioned and a report of Dr. J. E. Conrad, Director of the Department of Radiology, were apparently *all* rejected. Dr. Conrad's report reads as follows:

"The roentgen examination of the chest in the PA and lateral view shows some widening of the AP diameter of the thorax and retrosternal space. The inferior intercostal interspaces were somewhat widened. The diaphragms are flattened and the costophrenic sulci are shallow. The dorsal spine shows some hypertrophic arthritic changes. The arch of the aorta is slightly sclerotic but not unusually prominent. The cardiac silhouette is normal. The lung shields are somewhat hyperaerated. The underlying lung parenchyma shows a diffuse illdefined granular and somewhat nodular pattern with moderate accentuation of the hilar and juxta hilar densities.

Diagnosis: Early second stage anthracosilicosis complicated by moderate severe generalized pulmonary emphysema." (R. 118)

Dr. Conrad's report, relating to film taken on January 4, 1970, like the testimony of Dr. Purcell was rejected by the ALJ because of negative "Roentgenographic Interpretations" thereof made by Dr. Roemmich (R. 120), and Dr. Felson (R. 121). Explaining his rejection of *all* live testimony relative to the decedent's physical condition, the ALJ said as follows:

"* * * Although testimony of the miner's breathing problems is certainly not opposed by testimony to the contrary, there is convincing evidence that the problems did not manifest any indications by X-ray. Notwithstanding the fact that the X-ray reading of Dr. Conrad is found as fact to be inaccurate, Dr. Purcell testified that when *that* reading was rendered in *1969,* he suggested in effect that the miner hold the X-ray until he retired, for use in a later Workmen's Compensation claim. That advice is not unreasonable; however, it does not suggest total disability. Neither does the work record." (R. 11)

But Dr. Conrad's reading was not rendered in 1969. It was "rendered" in 1970. In fact it bears the date "1–14–70" and it appears the X-ray study was *made* that date—not in 1969. (R. 118) In fact, another film—a 1969 film—dated December 11, 1969, appears to have been read by Dr. Roemmich (R. 112, 112A), Dr. Rosenstein (R. 114) and Dr. Felson (R. 116). Thus, the ALJ must have been in error when he refers to Dr. Conrad's "inaccurate" reading of the 1969 film referred to by Dr. Purcell. Rather, Dr. Conrad read a January 14, 1970, film (R. 118). It is described by the ALJ "to be inaccurate" as a fact (R. 11). Here, he obviously relies upon Dr. Felson's form report, dated December 16, 1974 (R. 121) which related to a January 14, 1970, film not a 1969 film referred to by Dr. Purcell. Moreover, in so confidently relying upon Dr. Felson's form report (R. 121) the ALJ overlooks the fact that Dr. Felson has really done nothing more than charge that Dr. Conrad "grossly overread these films". But there was only *one* film of 1970 and only one is listed at R. 121 as read and yet Dr. Felson charges an overreading by Dr. Conrad of more than one film. There is no evidence that Dr. Conrad read the 1969 film or even saw it. This confusion cannot be resolved on the basis of *this* record and there is no need to resolve it because the only evidence contrary to that of plaintiff's witnesses is reflected in the roentgenographic readings. (R. 112, 112A, R. 114, R. 116, R. 120, R. 121). In at least one instance the film is considered of "poor" quality (R. 121), yet a negative result is reached. In one instance (R. 120), if not two (R. 112), *one* report is made relating to *two* films; i.e. "12–11–69" and "1–14–70". (See ink

notations on exhibits found at R. 112 and R. 120) For all these reasons we cannot accept the roentgenographic interpretations of the departmental readers as credible and substantial evidence supportive of the ALJ's findings and conclusions. Reports of departmental readers are subject to the same scrutiny as other evidence. Here, the ALJ has scrutinized, criticized and rejected all other evidence, but seemingly has blindly accepted the reports of departmental readers.

Still another matter deserves attention. In discussing the evidence, the ALJ said as follows:

"It is noted that the medications rendered cause as side affects (sic) dangerous intensification of symptoms, which undoubtedly played a part in the emotional disturbance of the claimant." (R. 11)

■ We have carefully reexamined the record, particularly the ALJ's examination of Dr. Purcell with reference to medications administered to the decedent, (R. 70–75) and nowhere do we find *any* evidence supportive of the ALJ's observation above quoted. The record is not precise as to what medications were administered. To the extent described, at least some were described as a "tonic". In any event, the evidence does not support the ALJ's observation or suggestion that medication contributed to decedent's emotional state. Rather, all credible evidence supports plaintiff's contentions as to the existence of pneumoconiosis, resulting disability, depression and suicide.

Judicial review of determinations made by the Secretary pursuant to the Federal Coal Mine Health and Safety Act is available under the same terms and conditions as is judicial review of determinations under Title II of the Social Security Act. Section 413(b) of the Act, 30 U.S.C. § 923(b), incorporates Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) by reference. Section 205(g) provides that "(t)he findings of Secretary as to any fact, if supported by substantial evidence, shall be conclusive."

■ The substantial evidence rule has been unanimously accepted and applied by the courts in Social Security cases, *Myers v. Richardson,* 471 F.2d 1265 (6th Cir. 1972); *Harrison v. Richardson,* 448 F.2d 638 (6th Cir. 1971); *Halsey v. Richardson,* 441 F.2d 1230 (6th Cir. 1971); *Maggard v. Weinberger,* 364 F.Supp. 1229 (E.D.Ky.1973). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and must be sufficient to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Pearles,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Laws v. Celebrezze,* 368 F.2d 640 (4th Cir. 1966). Also, the conclusiveness of the Secretary's findings of fact, where supported by substantial evidence, applies to inferences and conclusions that may reasonably be drawn from the evidence. *Campbell v. Gardner,* 370 F.2d 921 (6th Cir. 1967); *May v. Gardner,* 362 F.2d 616 (6th Cir. 1966); *Crawley v. Finch,* 300 F.Supp. 1343 (E.D.Ky.1969).

■ It is well settled that the burden of proof rests upon one who files a claim with an administrative agency to establish that the required conditions of eligibility have been met. This burden is to prove the case by a preponderance of the evidence. *Ryan v. Flemming,* 187 F.Supp. 655 (D.Mont. 1960); *Irvin v. Hobby,* 131 F.Supp. 851 (N.D.Iowa 1955); *Norment v. Hobby,* 124 F.Supp. 489 (N.D.Ala.1953). This rule has invariably been applied to claims arising under Title II of the Social Security Act: *Ragan v. Finch,* 435 F.2d 239 (6th Cir. 1970), *cert. denied* 402 U.S. 986, 91 S.Ct. 1685, 29 L.Ed.2d 152 (1971); *May v. Gardner, supra; Bartlett v. Secretary of Health, Education & Welfare,* 330 F.Supp. 1273 (E.D.Ky.1971); and is equally applicable to claims brought pursuant to Part B, Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended. Regulations No. 10, Section 410.240 and 410.475, 20 C.F.R. 410.240 and 410.475. Substantial evidence means just that and is not the equivalent of a "scintilla": *Hess v. Secretary of Health, Education and Welfare,* 497 F.2d 837 (3d Cir. 1974).

Concluding, as we do, that the findings and conclusions of the ALJ are not sup-

ported by substantial evidence, but, on the contrary, the credible and substantial evidence of record supports the plaintiff's claim, we shall grant the plaintiff's motion for summary judgment. In so doing, we see no area in which either party could conceivably produce credible and substantial evidence on remand tending to change the result. However, against the possibility that we are in this respect in error, we shall also provide for possible remand on motion.