Edward W. **HALSEY**, Plaintiff-Appellant,

v.

Elliott L. **RICHARDSON**, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 20472.

United States Court of Appeals, Sixth Circuit.

May 4, 1971.

Edwards, Circuit Judge, concurred in affirmance and filed opinion.

———◆———

Frank J. Neff, Columbus, Ohio, for appellant; Barkan, Barkan & Neff, Columbus, Ohio, on brief.

Gary T. Brinsfield, Columbus, Ohio, for appellee; William W. Milligan, U. S. Atty., Alvin J. McKenna, Asst. U. S. Atty., Columbus, Ohio, on brief.

Before EDWARDS and CELEBREZ-ZE,* Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

We consider the appeal of Edward W. Halsey from a summary judgment entered on March 6, 1970, which affirmed termination by the Secretary of Health, Education and Welfare of social security disability benefits which appellant had been theretofore receiving. Judgment was entered upon an opinion of Honorable Joseph P. Kinneary, United States District Judge, sitting in the District Court for the Southern District of Ohio, Eastern Division. The question before us is whether the District Court erred in finding that the Decision of the Secretary, affirming a trial examiner's decision, was supported by substantial evidence.

We affirm.

This matter has had a long history. Halsey suffered a back injury on February 17, 1959, while helping to unload a truck. He fell backward, landing on his hip, and a crate of frozen meat which he had been unloading fell on him. X-rays then taken disclosed a detachment of a laminal arch. Surgery was recommended, but Halsey refused it until July of 1960. A diagnosis was then made of a herniated intervertebral disc involving the lumbo-sacral spine. Surgery was then performed consisting of a trans-abdominal interbody fusion of the lumbosacral joint. In September of 1960, upon inquiry by the Ohio Bureau of Vocational Rehabilitation as to Halsey's post-operative progress, a Doctor Lester Lasky, Halsey's treating doctor upon whom Halsey places chief reliance, replied:

"Spinal fusion of this type requires approximately 6 to 8 months to become solid and about another 6 months to mature. Thus far Mr. Halsey's progress is satisfactory. Prognosis reasonably good."

Except for a period of rehabilitation training with the Goodwill Industries of Zanesville, Ohio, in the year 1966, Halsey has not worked for wages since his 1959 injury and his 1960 surgery. During a time prior to his obtaining social security benefits in 1963, he reported to one examining doctor that he was receiving $160 per month from the Ohio Industrial Commission (Workmen's Compensation) and "what I can get off the welfare" which amounts to $62.00 monthly. This doctor's report was dated September 22, 1962, and under diagnosis mentioned:

"Psychoneurotic Disorder—conversion reaction. During examination patient gave no objective sense of pain. It is also felt that examination revealed element of unconscious or even conscious compensation seeking. It is my feeling that patient's symptomatology is

---

* Judge Celebrezze took no part in this decision inasmuch as he was the Secretary of Health, Education and Welfare at the time of Halsey's original application for benefits.

an external substitute for his unconscious dependency needs."

We have early set out this quotation because like suggestions of Halsey's attitude appear in several reports of psychiatric examinations that were made over the years of appellant's persistence in seeking social security benefits. Halsey was 42 years old at the time of his 1959 accident, was married and the father of six children. He had completed a high school education and had worked at farming, coal mining, drill press operation, turret lathe operation, grinder in a machine shop, janitor and laborer in a packing plant, school bus driver, timber cutter, and coal truck driver.

Although his disabling accident occurred in February of 1959, his first application for benefits was filed on June 27, 1960. He therein described his impairment as "back injury." Medical examinations were had and investigation made following Halsey's application. The department notified him on several dates that he did not qualify for benefits. At Halsey's request his matter was reconsidered on several occasions. Denials by HEW continued. On June 19, 1964, he was again notified that upon reconsideration this Department determined that Halsey was not entitled to benefits. He was told of his right to have a hearing before a hearing examiner and of the time within which he would have to make a request for such hearing. Numerous reports of medical examinations had been received by the Secretary as part of its reconsideration of Halsey's claims.

Notwithstanding a tardy request therefor, Halsey was granted a hearing before an examiner, at which he was represented by counsel. This was held on February 9, 1965, and on March 28, 1965, the examiner determined that Halsey had not established entitlement to benefits between the time of his accident on February 27, 1959, and the date of March 1, 1963. It was his opinion, however, that Halsey's physical impairments in combination with psychoneurotic disorder had by March 1, 1963, so

developed that as of that date he could not engage in any gainful employment. His findings included the following:

"(4) The physical impairments of the claimant as of the last mentioned date, however, that could be considered medically determinable, when coupled with his psychoneurotic disorder, constituted 'disablement' within the meaning of the cited statutes;

"(6) Mr. Halsey's favorable age, however, and his seeming desire to be helped calls for all steps possible to be taken to assist in the rehabilitation that hopefully will prepare him in the indefinite future to return to light or moderate work activity; and

"(7) It is recommended the claimant be immediately offered rehabilitative help and that at least a yearly diary of investigation and possible examination in his case be maintained."

Consistent with the foregoing, HEW arranged for Halsey to submit himself to rehabilitative services of the Goodwill Industries of Zanesville, Ohio. A report from this agency dated July 27, 1966, contained the following:

"He is showing more confidence every day and we feel sure that this person is physically able to perform the tasks required to be a good small appliance repairman. The only problem we see is a possible mental incompetency where he is concerned. 'Does he feel he can do this?' 'Does he genuinely want to rehabilitate himself?' "

Halsey gave up his work at Goodwill Industries. He testified that he quit his work at Goodwill Industries because of pain and nervousness, and that at times he felt like throwing the appliance upon which he was working out of the window. HEW made further investigation of Halsey's continued claims of disability, including orthopedic and neurological examinations by qualified and neutral experts.

One of these, Dr. Robert B. Larrick, an orthopedic surgeon, reported on an examination conducted on October 20, 1967. After reviewing Halsey's asser-

tion of disability, this report contained the following:

"In evaluation of this patient, he gives a history of several injuries, the last of which was 8 years ago. The objectively positive findings are the 1″ atrophy of the proximal left thigh, the evidences of surgical scars, and the x-ray findings. *The limitations of back motion on request are incompatible with observed activities* such as his ability to assume the long seated position. On unannounced observation, he demonstrates an overall functional range of motion of between 50 and 75% at least. *The 'weakness' in his legs is incompatible with observed activity* such as getting on and off the table, having negative Trendelenburg test, and retaining his ability to walk on his heels and toes. If the 'weakness' were real, he could not even stand, much less walk. His gait improved remarkably on unannounced observation also.

"Regarding your specific questions, his mental attitude toward work appears to this examiner to be one of indifference and lack of interest. His overall residual functional capacity for work should be adequate for sustained light or medium activities that do not require excessive motion of or throw excessive strain on the low back and/or the lower extremities. *His abilities to stand, walk, dress, undress, and get on and off the examining table are not more than minimally impaired.* There was no opportunity to observe lifting, but on the basis of the history and the x-ray evaluation, this should be restricted to light lifting of 25 to 35 lbs. or less, depending upon the position in which the lift must be performed." (Emphasis supplied.)

Dr. Dwight M. Palmer of Columbus, Ohio, gave a report of a neurological and psychiatric examination of Halsey conducted on November 27, 1967. This report said:

"His thought content revealed that he was very much on the defensive side in terms of the psychiatric interview. *He was evasive and resistive* and frequently came up with statements such as, 'They have all that information.' He generally was vague in terms of specific medical material, whether it was in answer to questions about the nature of his 'spells' or as to the nature of his complaints. * * *

"*Motor Aspect:* His general attitude was that of a *vague, irritable, unconcerned subject who wanted to argue with the examiner.* When asked to describe his activities at home, he said, 'I try to keep going, sit around or lay around, but I haven't been able to do any manual labor. I don't hold up for more than an hour.' When the examiner pointed out to him that his palms were quite soiled and quite worn, he said they got that way, not from doing any manual labor, but from driving his car or helping his wife around the home. The only time he showed any emotion was when he talked with great resentment about the fact that he lost his farm to creditors.

"*Discussion:* A regular neurological examination of this man's nerves, spinal cord and brain have failed to reveal any evidence at all of neurological impairment. He complains about his lower back in a vague way but his pattern of complaint is not neurological, in that it does not fit any dermatome or schlerotome pattern. His knee and ankle jerks are well maintained and he does not have any sensory losses over his limbs.

"The psychiatric examination reveals an individual with some evidence of a personality deviation in terms of a passive-aggressive personality but no evidence at all of any true neurosis. This man is not beset by anxiety. His reflexes are quite normal and so is his blood pressure.

"It is apparent that this man is doing quite a bit of work from the appearance of his hands or else he is driving his car very extensively. In any event, there is no evidence at all that he cannot carry out all of the activi-

ties of daily living, except as he says, 'doing manual labor.'

"*Opinion:* There is no neurological impairment in this man and there is no significant psychiatric impairment. I find no condition of psychoneurosis to be present.

"In the event he is found eligible for benefits by your agency, his condition would not prevent him from managing the benefit payments in his own interests.

"You asked for comments on his functional ability. I have tried to cover this above, but I will add that he has no difficulty in sitting, standing, walking or getting his clothing on and off. He also has no difficulty in conversing and apparently he is either doing a lot of work with his hands or driving his car a great deal. He admits that he does drive an automobile. The condition of his muscles shows no evidence at all of regression of motor activities. Mentally, he is a passive-aggressive individual but this is a condition found in hundreds and thousands of individuals and is not a serious impediment to the activities of daily living. I would not feel that his functional ability is decreased on the basis of the fact that he is a passive-aggressive personality and has been one all of his life."

On the basis of the above disclosures and other investigative procedures, the Secretary by letter of December 18, 1967, notified Halsey that social security benefits were to terminate as of the end of January, 1968. Appellant promptly filed a Request for Reconsideration. Reconsideration affirmed the decision to terminate and led to another hearing before an examiner, the one which is before us on this appeal. Appellant places primary reliance upon his own doctor whose opinions consistently assert that Halsey has at all relevant times since his 1960 surgery been totally and permanently disabled. After an initial post-surgery observation "prognosis reasonably good" made on September 22, 1960,

this doctor made these subsequent reports:

"It is the opinion of this examiner that Mr. Halsey will not be able to return to gainful work because of the nature of his injury. It is unlikely that he can be rehabilitated." May 3, 1961.

On April 1, 1963, this doctor again reported that:

"Mr. Halsey has recovered from the surgery, and no further improvement is anticipated. It is the opinion of this examiner that Mr. Halsey will not be able to return to gainful work because of the nature of his disability. *We do not believe he can be rehabilitated because of the lack of incentive or educational background.*" (Emphasis supplied.)

On February 5, 1964, this doctor expressed his conclusion this way:

"We feel that he [Halsey] has made a maximum recovery in reference to his spinal fusion. We regard him as being totally and permanently disabled because of persistent back and leg pain. *We do not consider him fit for rehabilitation.*" (Emphasis supplied.)

This doctor's report of August 23, 1967, said:

"Mr. Halsey's condition is static and unimproved since our last correspondence. It is our opinion that he cannot and will not return to a gainful work. No improvement of his present condition is to be anticipated."

And on January 22, 1968, this doctor repeated his consistent view that,

"Mr. Halsey is unacceptable for employment in any type of industry and he cannot compete on the labor market. For these reasons we feel that he must be considered totally and permanently disabled. No improvement is to be anticipated."

It is to be noted that from the beginning this doctor insisted that Halsey would not be a good candidate for rehabilitation. However, except for an early observation that this was so because of

"the [Halsey's] lack of incentive and educational background," this doctor did not articulate the reasons which led to his conclusion that Halsey was not a good candidate for rehabilitation. The report of Goodwill Industries indicated the termination of his training there was Halsey's own decision.

The medical reports set out above represent a small portion of many examinations that were made of appellant Halsey. The record before us contains reports by some 21 doctors and 2 vocational experts. These and the testimonial record provided the Secretary and his examiners with the material from which they determined that payments to Halsey should terminate as of January 31, 1968. Three doctors gave some support to Halsey's treating doctor's claim of permanent and total disability. His opinion in this regard had no other support. Several reports indicated a reduced capacity for work, but there was evidence that Halsey could, with such reduced abilities, perform identified jobs then being performed in various places. One or more indicated the examiner's view that he had sufficient ability to return to one or more of the jobs at which he had been employed prior to the injury of February 27, 1959. Throughout these reports, evidence can be found that Halsey appeared to be a man of good health—looking younger than his age. Notwithstanding that need for psychiatric help was suggested, Halsey did not

seek it. A reading of his testimony at the last hearing on September 20, 1968, at which Halsey was represented by counsel, suggests a lack of candor and some dissembling.[1] Among the hearing examiner's findings is the following:

"Upon examination of the entire record, it is found that claimant is neither orthopedically nor psychiatrically impaired to the extent that he cannot work. He can perform at least some of the work he did in the past and he can engage in other occupations. His lack of motivation to seek employment is not occupationally disabling. Whether or not he has motivation to return to work does not prevent him from being able to do a job. It cannot be found that in and after November 1967 he was disabled within the definition of 'disability' in the Social Security Act."

We have reviewed the evidence at the above, and probably undue, length because appellant in his address to us emphasizes that Halsey's own treating doctor persisted in a claim of permanent and total disability. He refers to our holdings in Miracle v. Celebrezze, 351 F.2d 361 (6th Cir. 1965); Polly v. Gardner, 364 F.2d 696 (6th Cir. 1966); Branham v. Gardner, 383 F.2d 614 (6th Cir. 1967); and Colwell v. Gardner, 386 F.2d 56 (6th Cir. 1967). In these cases Judge McAllister emphasized the higher probative value of medical opinions of a claimant's own, longtime doctor as

1. The hearing examiner stated that Halsey's "testimony was somewhat evasive and cast doubt upon his overall credibility." His testimony initially reads as if his wife and one or more children lived with him and provided him with the help he needed in view of his claimed disabilities; it indicated that they were available to stretch his legs and pull on his back muscles to give him relief. When, upon further examination, he admitted that he had been separated from his wife and children for almost a year and lived alone, he asserted that his wife returned occasionally to clean the house and that the children stopped by frequently. Neither Halsey's wife nor any of his children were produced to support the latter assertion or otherwise corroborate his inability to do any work.

Halsey also did not explain the presence of 20 used automobiles and trucks around his home. He denied that he did any manual work. However, Dr. Palmer noticed that his palms were quite soiled and worn and expressed his view that appellant was doing quite a bit of work or driving his car extensively. The examiner concluded, "it seems that if he had as much difficulty as he alleged, claiming total inability to perform any work whatsoever, he would not have been able to do as much work or drive a car extensively as would be required to wear down his palms."

against a doctor who had had but one look at the claimant. We, however, do not read Judge McAllister's language in these cases as establishing a mechanical rule insulating a treating doctor's opinion from attack, no matter how respectable and persuasive may be opposing opinions by doctors who examined a claimant on only one occasion. We have observed above that Halsey's treating doctor provided but meager support for his unwavering view that Halsey was permanently and totally disabled. Judge McAllister's observations in *Miracle, Polly, Branham,* and *Colwell* must be read in their respective factual contexts. In those opinions, Judge McAllister properly argues that pain itself in some cases can be just as disabling as the most observable physical crippling. But a claimant's assertion that he is experiencing disabling pain does not foreclose attack on the credibility of such assertion. A factfinder's conclusion, based upon more persuasive evidence, either that the asserted pain does not exist or is of such moderate degree as not to foreclose gainful employment, is not forbidden. However respectable and well intentioned the opinions of Doctor Lester Lasky, Halsey's doctor, they are still subject to attack when thrown in contest with other and contrary respectable opinions. The factfinder was also at liberty, especially upon the record before us, to conclude that Halsey's claim of pain and the disabling degree thereof, was not worthy of belief. It is familiar law that the burden of establishing eligibility for social security benefits is upon the claimant therefor. Nelson v. Gardner, 386 F.2d 92, 94 (6th Cir. 1967); Whitt v. Gardner, 389 F.2d 906, 909 (6th Cir. 1968); 42 U.S.C. § 423 (d) (5). Neither this Court nor the District Judge consider the evidence de novo.

> "We look only to see whether there is substantial evidence supporting the factual findings of the Secretary and his hearing examiner. 42 U.S.C. § 405(g)." Nelson v. Gardner, 386 F.2d 92, 94 (6th Cir. 1967).

As was the District Judge, we are satisfied that the findings of the Secretary and his examiner are supported by substantial evidence.

Judgment affirmed.

EDWARDS, Circuit Judge (concurring).

There was substantial evidence to uphold the findings of the Trial Examiner and the Secretary. The medical opinions of Drs. Larrick and Palmer served to "commit [their] professional opinion[s] as to whether or not appellant is capable of working and as to what he can do" within the rule of Whitson v. Finch, 437 F.2d 728 (6th Cir. 1971).

I concur in affirmance.