Dena M. STONE, Plaintiff,

v.

Patricia Roberts HARRIS, Secretary of Health, Education and Welfare, Defendant.

No. C 79–1029.

United States District Court, N. D. Iowa, E. D.

June 9, 1980.

R. Kurt Swaim, Marsha Weinerman, Legal Services Corp. of Iowa, Dubuque, Iowa, for plaintiff.

James H. Reynolds, U. S. Atty., Cedar Rapids, Iowa, for defendant.

## ORDER

McMANUS, Chief Judge.

This matter is before the court on cross-motions for summary judgment filed by plaintiff on March 17, 1980 and by defendant on March 20, 1980. Defendant's motion granted.

On December 5, 1979, plaintiff filed her complaint seeking a review of the final decision of the Secretary of Health, Education and Welfare (the Secretary) denying her disability benefits under Title II, 42 U.S.C. § 401 et seq., and Title XVI, 42 U.S.C. § 1381 et seq., of the Social Security Act (the Act), as amended pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).

The record indicates that plaintiff, a resident of Dubuque, Iowa filed applications to establish a period of disability, for disability insurance benefits and for supplemental security income with the Department of Health, Education and Welfare (the Department) on March 20, 1978. Her application received consideration on May 9, 1978 and reconsideration on October 17, 1978; her claim for disability insurance benefits

was denied.[1] Her application for supplemental security income was also denied upon reconsideration of the Department's Social Security Administration on July 13, 1978.

At plaintiff's request, a hearing was held on January 18, 1979. Plaintiff, who was represented by counsel, testified as did another witness and a vocational expert. The Administrative Law Judge (ALJ) rendered a decision unfavorable to plaintiff on April 12, 1979, finding that plaintiff was not under a "disability" as that term is defined in the Social Security Act (the Act) and that she was not "disabled", as that term is defined in Title XVI of the Act when she applied for supplemental security income.

The Appeals Council of the Social Security Administration affirmed the hearing decision on October 10, 1979, after receiving additional evidence submitted by plaintiff. Thus, the ALJ's decision stands as the final decision of the Secretary.

In *Timmerman v. Weinberger*, 510 F.2d 439, 441 (8th Cir. 1975), the Court stated:

Under § 205(g) of the Social Security Act 42 U.S.C. § 405(g), this Court may only review the Secretary's decision regarding disability insurance to determine whether or not it is supported by substantial evidence in the record as a whole. "Substantial evidence" in turn, has been defined for purposes of the Act as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 841 (1971) (quoting from *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The court is of the opinion that the ALJ's decision is supported by substantial evidence in the record as a whole.

Plaintiff's application for disability insurance benefits shows that she was born December 2, 1955. Her application states that

---

1. Plaintiff previously had filed applications for disability insurance benefits on April 27, 1976 and August 4, 1977. They were considered and denied. No further action was taken on them and they are not now the subject of review.

she became unable to work in January, 1977 because she had trouble standing on her feet for any length of time and because her left knee was weak.

From 1973 until the time of the administrative hearing, plaintiff made at least sixteen visits to ten medical doctors. In September, 1973 Dr. Ross A. Madden, an internist and general practitioner reported that plaintiff had come to him with multiple complaints including weight control problems, headaches and nervousness. At that time plaintiff was five feet tall and weighed 244 pounds. The general physical exam was unremarkable except for tenderness in the upper middle region of the abdomen. The diagnosis at that time was exogenous obesity, functional vomiting, ruling out peptic disease, tension headaches and anxiety. Dr. Madden wrote that he next saw plaintiff on October 27, 1973 at which time she had lost six pounds. She again reported to him on November 26, 1973, having lost a total of nine pounds.

On March 24, 1974, plaintiff was examined at the University of Iowa Medicine Out Clinic. The physical exam was unremarkable except for obesity. The diagnoses were exogenous obesity, social and financial problems, functional abdominal pains unrelated to a small hiatal hernia without reflux. The Clinic recommended that plaintiff be placed on a 1,000 calorie diet, that she participate in a group reduction plan and that she engage in vocational rehabilitation in Dubuque in order to find a full-time, better paying job.[2]

Robert L. Barton, M.D., saw plaintiff on three occasions. On February 4, 1975 he treated her for folliculitis on the back of the neck by providing her with oral penicillin G and an ointment. By her next visit a month later the folliculitis had abated but she then had developed dermatitis of the lobules of both ears due to wearing stainless steel earrings. Dr. Barton provided her with another ointment and advised her to discontinue wearing the earrings. Finally in June, 1975, plaintiff had eczematoid dermatitis which was treated with an aristo-

cort cream. Dr. Barton wrote that none of the conditions he treated her for was disabling.

Dr. Ronald W. Schope, an internist, examined plaintiff on June 7, 1976 to determine whether she was disabled from either obesity or eczema. He noted that her eczema was actually dyshidrosis of the hands which seemed to be healing. The final diagnosis was massive obesity. At that time she was five feet tall and weighed 264 pounds. Dr. Schope concluded that:

> Her disability is actually quite mild if it could at all be considered a disability. There is no question she needs weight reduction. (Tr. 171).

On September 1, 1976, R. H. Lee, M.D., a psychiatrist and neurologist, wrote that plaintiff was grossly obese. He observed that her thinking was orderly and that she appeared glum but not significantly depressed. Her memory was intact and her intellectual resources appeared to be average. He diagnosed her condition as obesity and hysterical personality. Dr. Lee concluded that "Dena is significantly handicapped by virtue of her personality disorder and her obesity, however, it appears that her motivation is marginal also."

Dr. J. S. Avila, an orthopedic surgeon, reported on February 10, 1977 that plaintiff had complained of left knee pain. She informed him that she had fallen in October, 1976 and developed a lump on the left knee and was unable to kneel. He stated there was some pressure on the anterior knee but there was no locking sensation or effusion. The rest of the examination was normal including an x-ray of the left knee. Dr. Avila advised her to lose weight and actively exercise.

On June 16, 1977, plaintiff was examined at the University of Iowa General Medicine Clinic where she complained of left knee pain and various other aches and pains. The examination revealed some crepitus in the left knee but an x-ray of the left knee showed the joint to be normal. The examining physician, Dr. Kasik, reassured plain-

2. At that time plaintiff worked parttime as a dishwasher.

tiff there were no abnormalities in her knee. He advised her to go on a 1,000 calorie weight reduction diet.

James J. Heiring, M.D., completed a Disability Determination Services musculoskeletal questionnaire regarding plaintiff's condition. He diagnosed her condition as: bilateral genu valgum, a deformity in which the knees are abnormally close together and the space between the ankles is increased (known also as knock knees); bilateral metatarsus varus, a congenital deformity of the foot in which its inner border is off the ground with the sole turned inward which results in the patient walking on the outer border of the foot; bilateral pes planus (flat foot); bilateral cunieform wedge formation; and bilateral calcaneal exostosis, a benign bony growth projecting outward from the surface of the heel. Dr. Heiring concluded:

Because of the structural deformity of the bones of the foot, prognosis of the patient being able to assume an ambulatory position is poor. However, some type of semi-ambulatory or sitting position may be advised for employment. (Tr. 175).

W. B. Wignall, M.D., a family practitioner, wrote that plaintiff came to him on August 30, 1977 complaining that she "hurt all over". (Tr. 176). He reported that based on the examination and the laboratory data, no definite diagnosis could be reached. She suffered from apparent pain in joints and muscles. The cause of the pain was unknown, however, Dr. Wignall believed it was certainly aggravated by her gross obesity. In fact, he stated that "[T]he most remarkable thing about the patient's physical examination is her gross obesity. She is only five feet tall and weighs 266 pounds." (Tr. 176).

Plaintiff later complained to Dr. Wignall of an enlarged thyroid. Dr. Wignall found that her thyroid was in fact enlarged. However, all the thyroid tests were completely normal. Finally, in a disability determination questionnaire dated September 19, 1977, Dr. Wignall reported that plaintiff could do light work, lifting objects weighing up to twenty pounds and frequent lifting and carrying of objects up to ten pounds. However, he cautioned that she is restricted in her ability to walk and stand to a significant degree.

On April 25, 1978, John Brehm, M.D., reported the results of plaintiff's disability examination. Plaintiff complained of trouble with her arm, knee and foot. The examination showed restriction in the range of motion of plaintiff's left knee. The doctor believed that may be due to her enormous fat rather than to structural deformity. Dr. Brehm concluded that:

Her basic problem and the reason she cannot be employed is the obesity . . . She would not be able to perform any occupation which required prolonged standing or a great deal of walking, but I think she could probably handle sedentary work very well and I see no reason why any of her complaints should incapacitate her from this sort of employment. (Tr. 187–188).

The record also contains three other letters of Dr. Lee. The May 4, 1978 letter reports that plaintiff is participating in a weight control program and has lost over twenty pounds up to that time. His July 5, 1978 letter reports that plaintiff seemed to participate in the weight control program for about three months but that lately she had become so inconsistent that she had failed to lose any more weight. Dr. Lee stated his belief that plaintiff was unable to benefit from the program. He advised her not to invest any more time and money in it. Finally, on August 2, 1978, Dr. Lee wrote of plaintiff in part:

She was introduced to my Weight Control Program but failed to adhere to it even minimally and eventually the Social Welfare Department was advised to no longer support this program because of her failure to comply with it.

Physically her health is good except for her massive obesity which prevents her from doing many activities which she otherwise would be able to do.

Personality wise she is generally inadequate, lacks self discipline and persever-

ance and as a consequence is a poor candidate for training of any sort. She is depressed about her circumstances but is unwilling or unable to improve them by a dint of steady perseverance. (Tr. 189).

At the hearing, plaintiff testified that she was 23 years old, was five feet tall and weighed 300 pounds. She complained of back pain, pain in both feet, her left knee and arm, both wrists and one shoulder. She also complained of depression, occasional trouble sleeping, headaches and an inadequate personality.

Regarding her physical complaints, plaintiff testified that she can stand for approximately ten minutes before her back begins to hurt. She also testified she experiences pain when she walks or bends her left knee, that her wrists hurt when she moves them around and that she feels pain in her shoulder about once a month.

Regarding her psychological complaints, plaintiff testified that she was depressed for the entire year 1977. She took medication for her depression but has discontinued doing so. She said she still gets depressed at times. She further testified that she does not like herself and that, if she weren't a practicing Catholic, she probably would commit suicide.

Plaintiff described her daily activity. She begins her day at approximately noon, bathes and dresses and sits on a couch for several hours. She takes care of her house plants and cats. She occasionally washes dishes, cooks and dusts. She also testified that she shops for groceries and attends church.

Plaintiff stated that she attended school through the eleventh grade and received her high school diploma after successfully completing correspondence courses of La-Salle Extension University. Since receiving her high school diploma, plaintiff worked at the El Dorado Motel as a maid for one month. Next she worked for a year as a dishwasher in an establishment where she would also occasionally wait on customers, help the cook and operate the cash register. Later, plaintiff engaged in a temporary job selling coupon books over the telephone which lasted three weeks. Plaintiff testified that she believes she could work a sedentary job if it didn't involve operating a cash register.

Dr. John C. Grenfell, a vocational expert testified at the hearing as well.[3] He stated that he considers a person's age, education and prior work experience in evaluating that person's vocational capacity. Dr. Grenfell reviewed all the medical evidence prior to the hearing and he was present for plaintiff's testimony. The ALJ asked the vocational expert to assume from the medical and other evidence that plaintiff's combined impairments would not preclude sedentary work. He further asked the expert to consider also the personal factors mentioned above and to state whether there were any sedentary jobs which plaintiff could perform. Dr. Grenfell opined that plaintiff could work as a telephone operator, motel clerk, baby sitter, cashier, clerk in a self-service gasoline station, dispatcher for police or sheriff departments or ambulance or taxi companies, attendant in a laundromat or a clerk in a library. He noted that most of these positions would allow plaintiff to sit or stand as she desired. These jobs exist in significant numbers in the region where plaintiff lives.

The ALJ then asked the expert to assume that plaintiff had all the restrictions and limitations she testified to, and that her testimony was supported by medical evidence. In that case, the expert stated, plaintiff would be unable to work.

Subsequent to the hearing, plaintiff submitted additional medical evidence to the Appeals Council. Much of this confirms the evidence previously placed in the record regarding plaintiff's situation from 1974 forward. However, the additional evidence did include a report by Dr. Thomas Pieckenbrock who gave plaintiff a psychiatric eval-

---

**3.** Plaintiff's roommate, Andy Welty, also testified at the hearing. He generally confirmed plaintiff's statements that he does most of the housework and cooking while plaintiff mainly takes care of her plants and cats.

uation on April 27, 1979. He diagnosed her condition as personality trait disorder, mixed type, with inadequate and schizoid features. Dr. Pieckenbrock also reported that plaintiff had taken the Minnesota Multiphasic Personality Inventory in 1978. The test results were interpreted by Dr. James Barta, a psychologist at the Dubuque/Jackson County Mental Health Center. He found plaintiff was an extremely anxious person with very little ego strength. He characterized her as a worrier with very poor social relationships. Dr. Pieckenbrock wrote "[W]e fail to see how she could be considered employable, either on physical or psychological grounds, at this time." (Tr. 210).

The court is of the opinion that the record contains substantial evidence to support the ALJ's decision. There is no evidence that her inability to control her weight is the result of a glandular problem. There is evidence that when she has dieted, she has lost weight. Yet the record contains substantial evidence of her lack of motivation or discipline to continue practicing a weight reduction plan. Because her obesity is not caused by a glandular disorder, it is remedial. The record shows that several doctors attempted to place plaintiff on a diet but that after a short period of time she would deviate from it. Obesity which is remedial is not disabling within the meaning of the Act. *Mayhue v. Gardner*, 294 F.Supp. 853 (D.Kansas 1968), *aff'd*, 416 F.2d 1257 (10th Cir. 1969); *Stillwell v. Cohen*, 411 F.2d 574 (5th Cir. 1969).

The court is aware of the evidence regarding plaintiff's psychological condition. However, there is good reason to believe that if she adhered to a weight reduction program many of her psychological complaints would subside. *See, Stillwell v. Cohen, supra*, at 575.

Because there is substantial evidence to support the ALJ's decision which stands as the final decision of defendant, defendant's motion must be granted. It is not for this court to enter into a *de novo* review. *Halsey v. Richardson*, 441 F.2d 1230 (6th Cir. 1971).

It is therefore

ORDERED

Plaintiff's motion denied; defendant's motion granted.