**Wendell A. HOSKIN, Plaintiff,**

v.

**Patricia HARRIS, Secretary of Health and Human Services,[1] Defendant.**

**No. C 80–2008.**

United States District Court,
N. D. Iowa, E. D.

Sept. 2, 1980.

---

1. Plaintiff originally named as defendant, Patricia Harris, Secretary of Health, Education and Welfare. The "Department of Health, Education and Welfare" was redesignated the "Department of Health and Human Services" pursuant to P.L. 96–88, 93 Stat. 668 effective on May 4, 1980, when the education functions of the Department were transferred to the new Department of Education. No action is necessary to continue this civil action against defendant Patricia Harris in her official capacity as Secretary of Health and Human Services in accordance with section 205(g) of the Social Security Act (42 U.S.C. § 405(g)).

Joseph M. Moothart, Mershon, Snow & Knock, Cedar Falls, Iowa, for plaintiff.

Robert L. Teig, Asst. U. S. Atty., Cedar Rapids, Iowa, for defendant.

McMANUS, Chief Judge.

This matter is before the court on cross–motions for summary judgment filed by plaintiff on May 14, 1980 and by defendant on June 9, 1980. Defendant's motion granted.

On February 13, 1980, plaintiff filed his complaint seeking a review of the final decision of the Secretary of Health and Human Services (the Secretary) denying him disability benefits under Title II, 42 U.S.C. § 401 *et seq.*, and supplemental security income benefits under Title XVI, 42 U.S.C. § 1381 *et seq.*, of the Social Security Act (the Act), as amended pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).

The record indicates that plaintiff, a resident of Waterloo, Iowa filed applications to establish a period of disability, for disability insurance benefits and for supplemental security income with the Department of Health and Human Services (the Department) on September 27, 1978. His applications received consideration and were denied. Upon reconsideration, his claim for supplemental security income was denied on December 14, 1978 and his claim for disability insurance benefits was denied on February 10, 1979.

At plaintiff's request, a hearing was held on August 22, 1979. Plaintiff, who was represented by a paralegal with the Legal Services Corporation of Iowa, testified as did a vocational expert. The Administrative Law Judge (ALJ) rendered a decision unfavorable to plaintiff on September 21, 1979, finding that he was not under a "disability" as that term is defined in the Act and that he was not "disabled", as that term is defined in Title XVI of the Act when he applied for supplemental security income.

The Appeals Council of the Social Security Administration affirmed the hearing decision on December 12, 1979. Thus, the ALJ's decision stands as the final decision of the Secretary.

In *Timmerman v. Weinberger*, 510 F.2d 439, 441 (8th Cir. 1975), the Court stated:

Under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court may only review the Secretary's decision regarding disability insurance to determine whether or not it is supported by substantial evidence in the record as a whole. "Substantial evidence" in turn, has been defined for purposes of the Act as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting from *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

The court is of the opinion that the ALJ's decision is supported by substantial evidence in the record as a whole.

Plaintiff's application for disability insurance benefits shows that he was born April 1, 1946 and became unable to work on April 28, 1976, at the age of 30 because of emphysema, lung surgery, and high blood pressure.

From February, 1974, until the time of the administrative hearing, plaintiff made at least nineteen visits to at least thirteen medical doctors. On February 13, 1974, plaintiff had his chest x-rayed. R. W. Blanchard, M.D., reported that the diaphragms, bony thorax and heart were normal. Plaintiff's lungs showed "very mild early chronic irritation throughout but no active pathology." (Tr. 157).

On October 21, 1975, x-rays revealed a comminuted proximal phalangeal fracture in the left hand. S. N. Morrow, M.D., noted that the fracture fragments were satisfactorily aligned.

Plaintiff was admitted to the Allen Memorial Hospital on October 28, 1975, complaining of headaches, dizziness and nausea. Dr. Warren Nash, a general practitioner and plaintiff's treating physician reported that he had previously examined plaintiff in his office. At that time plaintiff did have some elevation of his blood pressure. Tests performed on plaintiff during his hospital stay revealed that his heart had a regular rate and rhythm and was without murmurs. His lungs sounded clear. In the extremities there were no scars, edema, or limitation of motion, except that the little finger on plaintiff's left hand was enclosed in a splint. His reflexes were active and equal bilaterally. Plaintiff's blood pressure measured 120/100. Routine laboratory tests were within normal limits. Plaintiff's pulse rate measured 88. In the discharge summary, Dr. Nash wrote:

EKG was normal. Chest x-ray and IVP within normal limits. The patient did have a small residual of urine on the IVP. The patient was treated with regular diet, bedrest and tranquilizers. The patient's blood pressure responded on bedrest alone and this was explained to the patient. The patient was dismissed on 11-1-75.

FINAL DIAGNOSIS: Hypertension-essential.

Condition on discharge improved. Patient's blood pressure on dismissal was 120/80. Prognosis good. Patient to be followed. (Tr. 141).

X-rays of plaintiff's left hand were again taken on November 3, 1975. They revealed that the bone fragments remained in good position, and that the fracture line was slightly burred, suggesting that callus was starting. X-rays taken two weeks later confirmed that the fracture continued to heal well.

In a progress record dated February 9, 1976, a doctor wrote that plaintiff reported his work was going well and his fingers were hurting him less, however, he reported they stiffen up in cold weather. The doctor noted that plaintiff had not done as much stretching of his fingers as he should have, yet the strength and range of motion in his hand were very close to normal.

On April 26, 1976, plaintiff underwent a pulmonary function test at the Allen Memorial Hospital. Robert G. Hathaway, M.D., noted that plaintiff had "a normal lung capacity with rather large increases in residual volume and functional residual capacity." (Tr. 184). Dr. Hathaway wrote that plaintiff's total expiratory flow volume was only 62% of the predicted volume. Maximum breathing capacity at that time was only 40% of the predicted level. However, use of bronchidilator aerosols produced modest to moderate improvement in all categories. Dr. Hathaway was of the impression that plaintiff had an obstructive airway disease with moderate respiratory impairment and with a significant degree of spasm present in the disease process.

Plaintiff was admitted to the hospital on May 1, 1976 complaining of chest pain and some shortness of breath. Dr. Nash reported that physical examination on admission was within normal limits. The doctor noted that plaintiff had some poverty of affect. Plaintiff was smiling as he described his symptoms of pain. Chest and upper gastro–intestinal x–rays were within normal limits. While in the hospital, plaintiff was treated with bronchodilators, regular diet, tranquilizers, analgesics and intermittent positive pressure breathing with mucomist twice daily. Dr. Nash reported that plaintiff did improve and was released from the hospital on May 11, 1976. Dr. Nash's final diagnosis was obstructive airway disease. Condition on discharge was improved and the prognosis was good.

Dr. D. A. Kerfoot, an internist, examined plaintiff on October 18, 1976, who at that time complained of intermittent left chest pain, increasing shortness of breath, intermittent tightness in both flanks and pain behind the knees. Plaintiff denied having a cough or producing sputum. Dr. Kerfoot observed that plaintiff's shortness of breath was mild but increasing. The pain behind his knees and the flank pain was also mild. The doctor reported that after a complete examination he could find no physical abnormalities whatsoever. In Dr. Kerfoot's view:

Mr. Hoskins presented with symptoms that suggest some abnormality of the heart and lungs, e. g., chest pain, difficulty in breathing, choking if he inhaled dust and so on. However, the further the discussion ranges the more clear it is that he has a variety of symptoms that really don't point to any one system. For example, he has headaches, pain in the flanks, fatigue, insomnia, and urinary difficulties. Clearly, the source of his troubles is in his relationship with life in general, and I'm certain that the correct diagnosis is not angina pectoris or chronic bronchitis, but a chronic anxiety state with depressive overtones. . . . I would regard the severity of this as moderate although I'm not sure that it is disabling. However, I am fairly certain that the prognosis is good with or without psychiatric help. The syndrome of chronic anxiety state with depressive aspects is fairly common, in my experience it often lasts two or three years, it can sometimes be helped by anti–depressant drugs, but on the whole is self–limiting.

FINAL DIAGNOSIS. Chronic Anxiety State with depressive aspects. (Tr. 174–75).

David Spaulding, a school psychologist, evaluated plaintiff on March 23, 1977. Plaintiff attained a full scale I.Q. of 76 on the Weschler Adult Intelligence Scale, which placed him on the borderline educable mentally retarded range of intelligence. He scored a verbal I.Q. of 77 and a performance I.Q. of 78.

Dr. Marvin F. Piburn, Jr., a psychiatrist, evaluated plaintiff on August 19, 1977. Plaintiff brought the data from David Spaulding and the October, 1976 report of Dr. Kerfoot with him to the evaluation. Dr. Piburn observed that plaintiff's complaints of shortness of breath which plaintiff called emphysema, fell into a pattern which could indicate hyperventilation episodes. The doctor reported that plaintiff's mood appeared normal; he didn't appear overtly anxious. Plaintiff did not display any profound symptoms of depression and he emphatically denied ever thinking of dy-

ing or committing suicide. Data from Mr. Spaulding indicated plaintiff's intelligence was limited, but he was oriented to year, month, day, date and time of day. Dr. Piburn found no evidence of organic brain damage, confusion or disorientation and there was absolutely no evidence of any active psychosis. Dr. Piburn was of the impression that plaintiff was intellectually handicapped which was reflected in the mild to moderate difficulty he had in understanding questions. He believed plaintiff was physically capable of working. His intellectual limitation and neurotic reaction interfered with his work performance, however. Dr. Piburn was unwilling to make the diagnosis of psychosis and had no major suggestions regarding psychiatric evaluation or treatment. He recommended plaintiff be enrolled in vocational rehabilitation and that he receive some sort of outpatient psychiatric followup. Dr. Piburn strongly suggested that an attempt be made to direct him back to employment.

In a Residual Functional Capacity Questionnaire filled out by Dr. Piburn, he estimated that plaintiff's ability to relate to other people was moderately impaired. He estimated there was no restriction as to plaintiff's ability to conduct his normal daily activities and found no deterioration in plaintiff's personal habits. Dr. Piburn estimated the limitation on plaintiff's ability to perform complex tasks was moderately severe but that his ability to perform simple tasks or to work in frequent contact or in minimal contact with other people was only moderately limited. He commented that plaintiff might be expected to perform at a mediocre level of skill and speed but would miss work due to physical complaints.

Plaintiff took a pulmonary function test at the University of Iowa Hospitals (University Hospital) on July 17, 1978. Results showed a mild restrictive ventilatory defect and diffusion capacity was severely impaired. Distribution of inspired gas and closing volumes were normal. Arterial blood bases showed mild respiratory alkalemia.

On July 26, 1978, plaintiff again took a pulmonary function test. The chest x–ray and all lab work was normal except for the pulmonary function test which was stopped prior to completion when plaintiff complained of labored breathing. Doctors reported there were too few data for them to make an extensive interpretation. However, they did state that his activity equivalents based on the test were (1) occupation comparable to housework or clerical duties and (2) sports comparable to golf or bowling.

Plaintiff was examined again at the University Hospital on August 2, 1978. George N. Bedell, M.D., reported that plaintiff's physical examination and chest x–rays were still normal. Dr. Bedell believed that plaintiff would have to undergo an open lung biopsy before a definite prognosis and diagnosis could be made.

The open lung biopsy was performed on plaintiff on August 25, 1978. He was discharged from the University Hospital on August 31, 1978, following an uncomplicated convalescence. The final report of plaintiff's biopsy specimen showed no particular etiology for his restrictive lung problem. In fact, the doctors reported, it was essentially a normal piece of lung except for some focal foreign material which was unidentifiable. The doctors reported finally, "[W]e have subsequently seen him in our clinic and he seems to be doing quite well from his operation." (Tr. 303).

Plaintiff was examined in the Thoracic Surgery Clinic on September 7, 1978 at the University Hospital in followup of the lung biopsy. The doctors wrote that plaintiff was feeling somewhat improved with less shortness of breath than in the past. His chest was clear to auscultation; the doctors scheduled no return appointment to their clinic.

Plaintiff also visited the Pulmonary Clinic at the University Hospital on September 7, 1978 with diagnosis of labored breathing, causes unknown. Physical examination showed clear lungs to auscultation and percussion, and normal chest x–ray. Dr. Geoffrey McLennan wrote that his examination

of plaintiff revealed no clear etiology for plaintiff's difficult breathing. No identifiable cardiac or pulmonary disease was found. Consequently, Dr. McLennan recommended that vocational rehabilitation continue, along with plans for plaintiff's employment under his current limitations.

J. E. Schoell, M.D., from the Division of Pulmonary Diseases of the University Hospital wrote on September 26, 1978, that he believed plaintiff had significant impairment of respiration which causes significant shortness of breath with more than simple physical labor. Dr. Schoell did not know what caused plaintiff's impairment. He recommended no specific therapy but recommended that efforts to rehabilitate him for work suitable to his apparent limitations be continued.

Plaintiff returned to the Pulmonary Clinic at the University Hospital on December 7, 1978. Physical examination revealed that the lungs were without rales, rhonci or wheezes. Heart examination and chest x-ray were normal. Dr. Joseph Sopko reported that pulmonary function test showed reversible airways obstruction and a restrictive defect.

On December 29, 1978 Dr. Nash wrote that plaintiff was disabled because of chronic obstructive pulmonary disease. He wrote that plaintiff was still having problems with dyspnea and chest pain even though he was on medication. Dr. Nash reported that he had last seen plaintiff on December 11, 1978, at which time his condition was unchanged.

J. B. Crandall, M.D., examined plaintiff on June 1, 1979. Plaintiff's blood pressure at that time was 110/70. His chest was of normal configuration and was not hypertympanitic. The chest expansion was quite poor. However, Dr. Crandall was not convinced plaintiff was breathing as deeply as possible. Lung sounds were perfectly normal, showing no evidence of obstruction. Heart size was normal by palpation and percussion, with no murmurs, rubs or gallops.

Dr. Crandall reported that he could make no objective findings to support the severity of plaintiff's complaints. He further reported that he was totally perplexed by plaintiff's gastrointestinal, genito–urinary and musculoskeletal complaints which seemed associated with muggy weather. He guessed that they could be functional problems but declined to say so with certainty.

It is important to note that plaintiff first applied for disability benefits on September 7, 1976. That application was denied initially and upon reconsideration on November 22, 1976. On that date plaintiff also filed an application for supplemental security income benefits which was also denied through the reconsideration level. Both applications were then denied again after a hearing on January 18, 1978. Plaintiff took no further action on those applications which, defendant correctly contends, are not now subject to review. Judicial review of an administrative decision may not be obtained unless an action is filed within sixty (60) days after the claimant is given notice of a final determination by the Secretary. 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ Plaintiff's second set of applications for benefits, which is now before the court, was filed on September 27, 1978. Plaintiff alleges the same disability onset date in the latter applications as he did in the former. The same impairments are also involved. The Secretary's final decision on plaintiff's first applications that he was not disabled covered a period through January 18, 1978. That decision is binding and beyond judicial review. *Harapot v. Califano*, 598 F.2d 474 (8th Cir. 1979). Thus, the ALJ properly invoked the doctrine of *res judicata* in his consideration of plaintiff's second applications and limited the scope of his inquiry to whether plaintiff has demonstrated a disability since January 18, 1978.

Plaintiff testified at the hearing that he is prevented from working presently by the same breathing problem which prevented him from working prior to January 18, 1978. He added that he also suffers from high blood pressure.

Plaintiff testified that he is married and has two children. His regular activity includes helping to prepare the meals for his two children and he helps them get dressed in the morning. He said he helps wash the dishes if he doesn't have to stoop too often. He also helps his wife with the laundry. He takes a walk during the day, weather permitting.

Plaintiff indicated that rainy and overcast weather make him dizzy and he experiences muscle spasms all over. He is also bothered by heat and high humidity. He testified that dust and fumes bother him and breathing cold air hurts his chest.

Plaintiff confirmed that he takes medication which helps his breathing; he also takes medication for his dizziness. He testified that he takes no medication for his blood pressure, which he said was pretty well under control.

Plaintiff said he can sit for about 40 minutes at a time before he begins to feel a pain in his chest. He testified that he can stand and walk for varying lengths of time before his legs begin to ache. Plaintiff said that he feels better if he alternates between sitting and standing but he testified that he didn't think he could do that consistently on an eight–hour a day basis.

G. Brian Paprocki, a vocational expert, also testified at the hearing. He testified that plaintiff's work history included jobs which ranged from unskilled to semi–skilled in nature and involved medium to very heavy lifting. Mr. Paprocki opined that plaintiff's semi–skilled and unskilled work characteristics could probably not be transferred to semi–skilled or skilled sedentary jobs.

■ The court is of the opinion that the ALJ's determination that plaintiff has not been under a "disability" as that term is defined in the Act and that he was not "disabled" pursuant to Title XVI of the Act are supported by substantial evidence in the record as a whole.

Plaintiff complained primarily of breathing problems and high blood pressure. He also complained of arm and leg problems, dizziness and headaches. The doctors who examined plaintiff for his breathing problems offered different views of the nature of the problem and the extent of the disability. Plaintiff's general practitioner, Dr. Nash, believed him to be disabled from a chronic obstructive pulmonary disease. However, other doctors interpreted the results of plaintiff's pulmonary function test to show he had the activity equivalent of occupations comparable to housework or clerical duties and sports comparable to golf or bowling. On repeated occasions physical examinations and chest x–rays of plaintiff were normal. Indeed, the ALJ found that medical evidence established that claimant has chronic obstructive and restrictive lung disease, old left arm injury with healed fracture of the little finger, intellectual deficits, anxiety and depression. He further found that plaintiff could not return to his former jobs. However, the ALJ first considered plaintiff's exertional limitations only and found that he has the residual functional capacity for at least sedentary work as defined in 20 C.F.R. § 404.1510. Next, the ALJ considered plaintiff's non–exertional limitations of intellectual deficit, mild anxiety and depression and found that they did not significantly affect his residual functional capacity for sedentary work. The ALJ also found that in view of plaintiff's age and residual functional capacity, the issue of transferability of work skills is not material.

■ Turning to the variations in the medical evidence and doctors' opinions, it is the task of the ALJ and not of this court to weigh the evidence, resolve the conflicts and decide the case accordingly. *Janka v. Secretary of Health, Education and Welfare*, 589 F.2d 365, 369 (8th Cir. 1978). Only one doctor, Warren Nash, stated that plaintiff was disabled. However, his opinion must be considered along with all the other evidence in deciding whether plaintiff was disabled:

> . . . the Secretary is clearly not bound by the conclusions of the plaintiff's physician regarding the existence of a disability and may reject his conclusions if there is substantial evidence to the

contrary. [Authorities omitted]. *Grates v. Califano,* 448 F.Supp. 674 (N.D.N.Y. 1978).

■ The record supports the ALJ's finding that plaintiff's impairments, considered individually or collectively, were not severe enough to preclude him from engaging in substantial gainful activity. The ALJ recognized plaintiff's subjective complaints of pain and gave them due weight. Not all pain is disabling. In order to be disabling, the pain must be unremedial and must preclude plaintiff from engaging in any substantial gainful activity. *Adams v. Richardson,* 336 F.Supp. 983 (D.Kan.1972). Moreover, it is for the trier of fact to observe plaintiff's demeanor and physical appearance in assessing the credibility of subjective complaints of pain. *Smith v. Califano,* 457 F.Supp. 145 (D.Md.1978).

Because the decision of the Secretary is based on substantial evidence from the entire record, defendant's motion for summary judgment must be granted. It is not for this court to enter into a *de novo* review. *Halsey v. Richardson,* 441 F.2d 1230 (6th Cir. 1971).

It is therefore

ORDERED

Plaintiff's motion denied; defendant's motion granted.